304 Ga. 224
FINAL COPY

S18Q0757.  NATIONAL CASUALTY COMPANY v. GEORGIA SCHOOL
BOARDS ASSOCIATION – RISK MANAGEMENT FUND.


HINES, Chief Justice.

This appeal is before this Court on a certified question from the United States District Court for the Northern District of Georgia[1] in this insurance coverage dispute between plaintiff National Casualty Company ("National"), a commercial insurer, and defendant Georgia School Boards Association – Risk Management Fund ("Risk Fund"), an interlocal  risk management agency created pursuant to Article 29 of Chapter 2 of Title 20 of the Georgia Code, OCGA § 20-2-2001 et seq.[2] The gravamen of the question certified[3] is whether

_____

[1] 1983 Ga. Const., Art. VI, Sec. VI, Par. IV; OCGA § 15-2-9.

[2] An "interlocal risk management agency" is defined as "an association formed by boards of education by the execution of an intergovernmental contract for the development and administration of an interlocal risk management program and one or more group self-insurance funds." OCGA § 20-2-2001 (6).

[3] The following question as specifically posed by the District Court is premised upon the District Court's finding that the applicable excess coverage provisions are irreconcilable, and the correctness of such finding is not at issue before this Court:

When an insurance policy issued by a commercial company . . . has a provision that states that the policy is excess to the liability of another insurer overlapping coverage and . . . that provision conflicts with the excess coverage provision in an insurance agreement issued by

Georgia law or public policy precludes a commercial insurance policy that is excess to coverage provided under OCGA § 20-2-2002.[4]  For the reasons that

_____

an agency created under OCGA § 20-2-2002, does the irreconcilable provision rule [as set forth in *State Farm Fire & Cas. Co. v. Holton*, 131 Ga. App. 247 (205 SE2d 872) (1974)], require each insurer to pay a pro rata share of the loss?

[4] OCGA § 20-2-2002 provides:

(a) A group of boards of education may execute an intergovernmental contract among themselves to form and become members of an interlocal risk management agency. After an interlocal risk management agency has been formed, any board of education may, subject to the bylaws and requirements of such agency, become a member and, through participation in the agency, may:

(1) Pool its general liability risks in whole or in part with those of other boards of education;

(2) Pool its motor vehicle liability risks in whole or in part with those of other boards of education;

(3) Pool its property damage risks in whole or in part with those of other boards of education; or

(4) Jointly purchase general liability, motor vehicle liability, or property damage insurance with other boards of education participating in and belonging to the interlocal risk management agency, the participating boards of education to be coinsured under a master policy or policies with the total premium apportioned among such participants.

(b) Except for the boards of education of independent school systems which elect to participate in an interlocal risk management agency for municipalities established pursuant to Chapter 85 of Title 36, there shall be only one interlocal risk management agency established for boards of education; provided, however, if the Commissioner determines that there are special or unique circumstances or special needs of groups of boards of education which justify the establishment of an additional interlocal risk management agency or agencies, he may authorize the establishment of such additional agency or agencies. Each agency may establish such group self-insurance funds as may be authorized by the Commissioner.

(c) All arrangements and agreements made under the authority of this article shall be in writing. A board of education may become a member of an interlocal risk management agency by the adoption of a resolution by the board of education. The interlocal risk management agency shall operate under such name and style as shall be provided in the intergovernmental contract creating such agency and shall have the power to bring and defend actions in all courts.

(d) All books, records, and files maintained by any administrator of any fund

follow, we conclude that there is no such prohibition.

*Factual Background*

The facts as found by the District Court are the following. National and Risk Fund provide overlapping liability coverage to members of the Professional Association of Georgia Educators ("PAGE"), a professional association of teachers and administrators. National issued insurance policies to PAGE for the periods July 1, 2012, to July 1, 2013, and July 1, 2013, to July 1, 2014 (collectively the "Policies"). The Policies provide liability coverage to PAGE members:

> **Coverage A — Liability Coverage**
>
> The Company will pay on behalf of the insured all sums which the Insured shall become obligated to pay by reason of liability imposed by law or for monetary damages resulting from any **CLAIM** made against the insured arising out of an **OCCURRENCE** in the course of the activities of the insured in his/her professional capacity and caused by any acts or omissions of the insured or any other person for whose   acts the insured is legally liable. The Company shall defend any suit seeking monetary damages which are payable under the terms of the policy, even if such suit be groundless, false or fraudulent; but the Company may make such investigation, negotiation and settlement of any **CLAIM** or suit as it may deem

established by the agency, including but not limited to audit data and all active and inactive claim files, shall at all times be the sole property of the agency and shall be surrendered immediately to the agency upon demand.

expedient.

The Policies also contain a provision limiting coverage for liabilities covered by "other insurance" ("Other Coverage Provision"):

**Other Insurance**

This policy is specifically excess if the insured has other insurance of any kind whatsoever, whether primary or excess, or if the insured is entitled to defense or indemnification from any other source whatsoever, including by way of example only, such sources as state statutory entitlements or provisions. Other insurance includes, but is not limited to, insurance policies, state pools, and programs of self-insurance, purchased or established by or on behalf of any **EDUCATIONAL UNIT**, to insure against **CLAIMS** arising from activities of the **EDUCATIONAL UNIT** or its employees, regardless of whether or not the policy or program provides primary, excess, umbrella or contingent coverage.

In addition, Coverage A [Liability Coverage] is specifically excess over coverage provided by any **EDUCATIONAL UNIT'S** or school board's errors and omissions or general liability policies, purchased by the insured's employer or former employers, or self-insurance program or state pools, whether collectible or not, and it is specifically excess over coverage provided by any policy of insurance which purports to be excess to a policy issued to the insured.

Risk Fund's risk-sharing arrangement is set forth in coverage agreements entered into by Risk Fund and its members ("Coverage Agreements").  Under

4

the Coverage Agreements, Risk Fund provides liability coverage to members and their employees, including PAGE members. The coverage periods are July 1, 2012, to July 1, 2013, and July 1, 2013, to July 1, 2014. Risk Fund's coverage includes liability coverage for personal injury, bodily injury, property damage, negligent acts, wrongful acts, and sexual abuse. Risk Fund is required to "pay [amounts a] Member becomes legally obligated to pay as damages" and to "defend . . . Member[s] against any 'suit' seeking those damages." Risk Fund's members are jointly and severally liable "for all legal obligations" arising under the Coverage Agreements.

The Coverage Agreements contain a provision limiting coverage where insurance is available from another source:

**4. Insurance.**

If valid and collectible insurance is available to the Member for a loss covered by [Risk Fund] under any coverage parts within this Coverage Document, the obligations of [Risk Fund] are excess over the available and collectible insurance.

From 2014 to 2016, several lawsuits were filed against PAGE members covered under the Policies and the Coverage Agreements ("Covered Members"). National refused to defend or indemnify these Covered Members

until coverage under the Coverage Agreements was exhausted. National contended that the Other Coverage Provision in the Policies made it only an excess insurer. Risk Fund contended that National is the primary insurer and that Risk Fund is required only to provide excess coverage. Because of National's refusal to provide primary coverage, Risk Fund defended, indemnified and paid settlement amounts on behalf of the Covered Members, pending resolution of the present amended complaint for declaratory judgment filed by National.

*Procedural History*

The amended complaint sought a declaration that Risk Fund has "the primary duty to defend and indemnify" Covered Members against whom suits have been filed. Risk Fund filed a counterclaim for breach of contract, contribution, unjust enrichment, and declaratory judgment. National moved for summary judgment on its claim for declaratory relief and on Risk Fund's counterclaim for declaratory relief. Risk Fund moved for partial summary judgment, seeking a declaration that (1) "coverage owed to jointly covered persons under [National's Policies] is primary to coverage provided under" Risk Fund's Coverage Agreements, or (2) the parties "must share coverage owed to

jointly covered individuals on a pro rata basis." The District Court found that Risk Fund was entitled to summary judgment on its request for a declaration that National's Other Coverage Provision is irreconcilable with Risk Fund's Other Coverage Provision, and that the parties "must share defense and indemnity coverage on a pro rata basis." Consequently, it denied National's motion for summary judgment and granted Risk Fund's motion for partial summary judgment. Both National and Risk Fund moved for reconsideration. Upon reconsideration, the District Court issued the present "opinion and order" certifying its question to this Court. It did so after finding that the irreconcilable provisions rule as set forth in *State Farm Fire & Cas. Co. v. Holton*, 131 Ga. App. 247 (205 SE2d 872) (1974), has developed only in cases involving conflicts between commercial insurance policy provisions, and so it questioned whether that rule applies to coverage provided by an entity entrusted with public funds, thereby implicating Georgia public policy and the interpretation of Georgia law.

*Discussion*

As was explained in *Holton*, in the circumstances in which two insurance policies provide overlapping coverage, i.e., they insure the same risk during the

7

same time frame, resolution of the issue of insurance liability requires examination of the  policies' "Other Insurance" provisions, which describe at which point each policy's coverage attaches.  And, if the two entities providing insurance

> attempt to limit their liability to excess coverage if there is other insurance, then the clauses are irreconcilable, cancel each other out, and the liability is to be divided equally between them.

Id. at 248-249 (3) (citations and punctuation omitted).

Of necessity, the initial inquiry is the meaning of the insurance policy provisions at issue.  The interpretation of an insurance policy is subject to the relevant general rules of contract construction, the cardinal rule being to determine and carry out the intent of the parties. *Bell v. Liberty Mut. Fire Ins. Co.*, 319 Ga. App. 302, 305 (1) (734 SE2d 894) (2012). In making the determination of intent,  a court is to  consider the insurance policy as a whole, and a preferred construction will give effect to each provision, attempt to harmonize the provisions with each other, and not render any of the policy provisions meaningless or mere surplusage. *York Ins. Co. v. Williams Seafood of Albany*, 273 Ga. 710, 712 (1) (544 SE2d 156) (2001).  Furthermore, "[t]he

policy should be read as a layman would read it. Additionally, exclusions will be strictly construed against the insurer and in favor of coverage." Id. Finally, Georgia law provides that "insurance companies are generally free to set the terms of their policies as they see fit so long as they do not violate the law or judicially cognizable public policy." *Reed v. Auto-Owners Ins. Co.*, 284 Ga. 286, 287 (2) (667 SE2d 90) (2008).

As noted, the District Court has already determined that National's Other Coverage Provision is in direct conflict with Risk Fund's Other Coverage Provision, and the correctness of that determination is not now at issue before this Court. The question becomes whether there is any Georgia law or public policy justifying a departure from the basic rules of insurance contract construction and abandonment of the analysis set forth in *Holton*. Risk Fund has argued that the traditional analysis is not applicable when an interlocal risk management fund is involved because public policy dictates that, irrespective of the documents' bargained-for contractual terms, commercial insurance always should exhaust before any publicly funded risk management monies are spent. But, there is no basis in Georgia law or public policy for such an approach. In fact, the law and public policy concerns dictate quite the contrary.

As National notes, there is no state law violated by a commercial insurer accepting a risk at a certain premium rate in reliance upon a contractual term that any coverage it affords is specifically made excess above any other source of insurance or indemnity, expressly including any "state pools and programs of self-insurance," available to its insured. Nor is such a provision void as against any recognized public policy. Indeed, "it is the paramount public policy of this State that courts will not lightly interfere with the freedom of parties to contract on any subject matter, on any terms, unless prohibited by statute or public policy, and injury to the public interest clearly appears." *Bryan v. MBC Partners, L.P.*, 246 Ga. App. 549, 552 (3) (541 SE2d 124) (2000).

Certainly, as Risk Fund urges, there is also a longstanding public policy of protecting the public purse; however, its reliance on *Googe v. Fla. Intl. Indem. Co.*, 262 Ga. 546 (422 SE2d 552) (1992), and *Martin v. Ga. Dept. of Pub. Safety*, 257 Ga. 300 (357 SE2d 569) (1987), to demonstrate how expecting it to equally participate in the excess coverage violates such public policy is misplaced.[5] *Googe* and *Martin* were decided under a former version of Article

_____

[5] Risk Fund also cites OCGA § 20-2-2004 in support of its argument that interlocal risk management pools are exempt from any discussion of priority as between such risk pools and commercial insurance. OCGA § 20-2-2004 does provide that "[a]n interlocal risk management

10

I, Section II, Paragraph IX of the 1983 Constitution, which waived sovereign immunity for the State or its agencies when there was liability insurance covering the subject claims. While the opinions plainly highlighted the need for protection and preservation of public monies, they did so in the context of compensation for injured members of the public in light of the broad sovereign immunity then enjoyed by state actors. The Georgia Tort Claims Act, OCGA § 50-21-20 et seq., limited such immunity. The immunity provided under the Act "is limited to torts committed by a 'state officer or employee' who was acting within the scope of his or her official duties or employment on behalf of a specific 'state government entity.'" *Hartley v. Agnes Scott College*, 295 Ga. 458, 463-464 (2) (b) (759 SE2d 857) (2014). More significantly, most of the public policy concerns underlying the doctrine of sovereign immunity are inapposite to the consideration of how a school district may choose to protect itself from liability exposure. That issue implicates other public policy

agency created pursuant to this article is not an insurance company or an insurer under Title 33, and the development and administration by such agency of one or more group self-insurance funds shall not constitute doing business as an insurer"; however, whether an entity like Risk Fund is an "insurer" for the purposes of regulation by Georgia's Insurance Code, Title 33, is a different issue than the one now before this Court. The statute does not negate the legislatively-mandated option of liability coverage via an interlocal risk management agency nor impose any requirement that payment by available commercial insurance must precede payment of any risk pool funds.

concerns.

In enacting OCGA § 20-2-990 et seq., which requires public schools to protect themselves from liability exposure through the purchase of liability insurance and/or contracts of indemnity, the General Assembly sought to address what it termed the "urgent crisis" confronting public education in Georgia.[6]  In order to address such crisis, boards of education are permitted to pool their general liability risks to form and become members of interlocal risk management agencies as an alternative to purchasing commercial liability insurance. OCGA § 20-2-2002.  As reflected in its findings, the General Assembly recognized that the expenditure of public funds to protect against education professionals' liability, even as pooled in an interlocal risk

_____

[6] OCGA § 20-2-990 contains express legislative findings in this regard:

The General Assembly finds that an urgent crisis confronts public education in Georgia. Evolving constitutional principles established by recent judicial decisions impose increased burdens upon school administrators and boards of education and subject them to personal liability under judicial doctrines so unsettled as to render it difficult to predict the legality of actions in advance. Consequently, responsible and competent persons declined to accept appointment and employment, with resulting detriment to public administration. This crisis has become so grave that immediate relief is essential to quality education, and the purchase of protection through liability insurance and contracts of indemnity, and the defense of civil and criminal actions at public expense, as part of the public compensation paid to such officials and employees, offers the only feasible solution. Therefore, the General Assembly finds that the expenditure of public funds for such purposes in these circumstances is for educational purposes and in furtherance of the support and maintenance of public schools and public education.

12

management fund, is "essential to quality education." OCGA § 20-2-990. Those

funds have been deemed to be "for educational purposes" and part of the public

compensation paid to state education professionals. Id. There is no requirement

that either the insurance purchased or the risk management pool established

apply only in excess of any available commercial insurance. Had that been the

intent of the General Assembly, it had the opportunity to say so. The General

Assembly expressly authorized the use of public funds for the exact purpose for

which interlocal risk management agencies like Risk Fund are formed. In fact,

the fallacy of the contention that the sovereign immunity concerns of *Googe* and

*Martin* in regard to the "public purse" govern the issue at bar is apparent by the

express language of OCGA § 20-2-992, which states:

> Nothing in this article shall be construed as waiving any immunity or privilege now or hereafter enjoyed by the State Board of Education, by the board of control of any cooperative educational service agency, by any local board of education, by any member of any such board, or by any employee of the state board, school superintendent, principal, teacher, administrator, or other employee or as waiving any immunity or privilege of any state or other public body, board, agency, or political subdivision.

Thus, the public policy concerns underlying *Googe* and *Martin* were already

considered and addressed by the General Assembly in enacting OCGA §

13

20-2-990 et seq. The express preservation of immunities is the way in which the "public purse" is protected.

Simply, there is no apparent public policy which would be furthered by the requirement that commercial insurance funds be exhausted before the legislatively mandated public funds set aside to protect education professionals against employment-related liability are used. In fact, the bedrock public policy of freedom of contract would be frustrated if there were such a requirement. In addition, insurance policies are not only a matter of contract, they are "also a matter of public concern because rulings in cases involving common policies obviously affect risk and associated insurance rates at a mass level." *Mass. Mut. Life Ins. Co. v. Woodall*, 304 FSupp.2d 1364 (S.D. Ga. 2003). Rendering meaningless the bargained-for "other insurance" provisions contained in commercial insurance policies in favor of contemplated publicly funded sources of insurance based on a public policy requiring the exhaustion of all commercial funds would interfere not only with an insurance company's freedom to contract with its insureds but also undoubtedly adversely affect the premiums paid for liability policies to protect the education professionals of this State.

*Conclusion*

14

Insurance contracts are properly construed and applied as written unless prohibited by law or public policy, and there is no law or public policy in Georgia which prohibits the found application of the "other insurance" policy provisions at issue and utilization of the priority of coverage analysis articulated in *Holton*.[7]

Certified question answered. Melton, P. J., Benham, Hunstein, Nahmias, Blackwell, Boggs, and Peterson, JJ., concur.

---

[7] I hope that in my 50-year legal career I have, in some small measure, helped burnish the rule of law. "FIAT JUSTITIA RUAT CAELUM."

Decided August 14, 2018.

Certified question from the United States District Court for the Northern District of Georgia.

Gray, Rust, St. Amand, Moffett & Brieske, Michael J. Rust, David C. Sawyer; Phelps Dunbar-LA, Jay R. Sever, Katie Myers, for appellant.

Hall Booth Smith, C. Michael Johnson, Thomas K. Wingfield, for appellee.