[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-15392
_____

D.C. Docket No. 1:16-cv-01600-MHC


ACE AMERICAN INSURANCE COMPANY,
a Pennsylvania corporation,

Plaintiff-Counter Defendant-Appellant,

versus

THE WATTLES COMPANY,
a Washington corporation,

Defendant-Counter Claimant-Appellee.


_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(July 19, 2019)


Before ED CARNES, Chief Judge, ANDERSON and JULIE CARNES, Circuit Judges.

ANDERSON, Circuit Judge:

This appeal involves a complicated property insurance coverage dispute between an insurer and a landlord claiming through its prior tenant, the named insured under the relevant policy.  The insurer, Ace American Insurance Company ("Ace"), appeals the judgment of the district court granting summary judgment—and a coverage award of $1,133,918.93—to the landlord, The Wattles Company ("Wattles").  Ace argues that the $2 million policy deductible has not been met.[1]  Because the district court erred in concluding the deductible was satisfied, we reverse and remand with instructions to enter summary judgment—and an order declaring that the policy does not provide coverage for Wattles's claims—in favor of Ace.

## I.  BACKGROUND

### A.  Factual Background.

*1.  Exide leases industrial building from Wattles for use in its battery formation operations.*

Starting in the early 1980s, Wattles leased an industrial office building and warehouse located in Sumner, Washington (the "Building") to Exide Technologies, Inc. ("Exide").  Under a series of written lease agreements, Exide used the

---

[1] Ace mounts several other challenges to the rulings of the district court, including an argument that the policy should have been reformed to include an omitted pollution exclusion, that the "corrosion" or "gradual deterioration" exclusion should have been applied to bar coverage, and that Wattles had no authority to recover Exide's defense costs.  In light of our holding that the $2 million deductible has not been satisfied, we need not address these additional arguments raised by Ace.

2

Building to conduct battery formation operations until about 2009. These operations involved filling lead batteries with sulfuric acid and charging them, which caused sulfuric acid mist to be emitted into the warehouse space within the Building.

*2. Exide works through its insurance broker to obtain insurance policies from Ace and other insurers as part of a worldwide property insurance program for 2006–2007.*

Sometime in 2006, Exide instructed its insurance broker Marsh USA ("Marsh") to renew its international property insurance program for the 2006–2007 term. Marsh then sent an underwriting submission out into the marketplace requesting quotes from various insurers. Ace responded to the underwriting submission through its managing general agent Starr Technical Risks Agency, Inc. ("Starr"), and Exide eventually authorized Marsh to instruct Starr to bind coverage for a portion of the 2006–2007 program. Starr primarily worked with the insured's broker (Marsh) and not the insured (Exide) in underwriting Ace's portion of the insurance program. As Ace's managing general agent, Starr had "entire authority" to issue and sign insurance policies for Ace.

Starr, on behalf of Ace, issued revised Binder No. 0638, which identified Exide as the named insured and revealed total insured property values in excess of $3 billion. Ace agreed to provide up to $60 million per occurrence in coverage, or up to 20% of the cumulative limit of the $300 million per occurrence program

3

assembled by Marsh.  Several other insurers, including AIG and Allianz, covered the remaining $240 million in risk.  Exide agreed to pay Ace a total annual premium equal to $900,000.

Ace, through Starr, eventually issued property insurance Policy No. PGL N0 19 28 24 7 (the "Policy"), which covers the period from September 1, 2006 through September 1, 2007.  The Policy is not a general liability policy; rather, it is a policy of property insurance.  It "insures against all risks of direct physical loss of or damage occurring during the Term[2] of Insurance to property described [in the Policy]."  The record before this Court does not contain a schedule describing the specific property locations insured under Exide's 2006–2007 insurance program, but the "Global Property/Boiler & Machinery Program Specifications" (the "Program Specifications") included at the beginning of the Policy identify a "Worldwide" territory, excluding Afghanistan, Cuba, Iran, Iraq, Libya, North Korea, and any other countries subject to U.S. State Department trade or economic sanctions.  The Policy also identifies specific program sublimits applicable to losses occurring in the Netherlands, Germany, Japan, and Mexico.  In addition to domestic endorsements applicable in thirty-seven states within the United States, the Policy contains coverage exclusions that refer to the countries of Spain, France,

---

[2] Any capitalized term that is not otherwise defined in this opinion shall have the meaning, if any, given to such term in the Policy.

4

Germany, and South Africa.  Notwithstanding the clearly international character of

Exide's 2006–2007 insurance program (of which the Policy is a part), Ace and

Exide agreed that the law of the State of Georgia would govern the interpretation

of the terms and conditions of the Policy.

    *3.  The Policy includes three coverages that are potentially relevant in this case, all of which are subject to a $2 million per occurrence deductible.*

    The Policy covers three specific categories of losses that potentially relate to

this case.[3]  First, section 7.A.(3) of the Policy (the "Leased Property Coverage

Provision") covers damage to "Real and Personal Property of others . . . which is in

the Insured's [Exide's] care, custody, or control."  Second, and most relevant to

our disposition of this appeal, section 8.(J) of the Policy (the "Tenants and

Neighbors Provision") expressly extends coverage under the Policy to include

> (1)   (a)   The liability which the Insured incurs as a tenant for damage to real and personal property by a peril insured against;
>
>    (b)   The liability which the Insured incurs for damage to real or personal property from a peril spreading from the Insured's premises to the premises of neighbors and co-tenants;

---

[3] The Policy also excludes from coverage and does not insure against, among other things, losses resulting from corrosion and gradual deterioration.  Additionally, the Policy omits a pollution exclusion that appears in other policies issued by other insurers that participated in Exide's 2006–2007 property insurance program, and the parties spend much of their time here arguing about whether the Policy should be reformed to include a pollution exclusion on account of a mutual mistake (which would have the effect of excluding coverage in this case).  Because we decide this appeal on grounds that the Policy deductible has not been satisfied—and not on grounds that coverage should be excluded under the corrosion/gradual deterioration exclusion or, if the Policy were to be reformed on the basis of mutual mistake, under a pollution exclusion— we omit any discussion of the relevant exclusions and any other facts relevant to those issues here.

(c)    The liability which the Insured incurs as landlord for damage to the personal property of tenants by a peril insured against as a result of constructional defects or lack of maintenance.

(2)    This extension applies only to liability incurred in those countries in which a Napoleonic or other civil or commercial code applies due to loss or damage by a peril as defined by such code and as insured hereunder.

Third, subject to a $500,000 sublimit, section 8.(F) of the Policy (the "Defense Costs Provision") covers "the costs and fees to defend any claim or suit against the Insured alleging physical loss or damage as insured against to property of others in the care, custody or control of the Insured." Like other coverages under the Policy, these three coverages—damage to property leased by Exide, liability incurred by Exide under the Tenants and Neighbors Provision, and Exide's own defense costs—are all subject to an occurrence-based deductible before the Policy provides any coverage at all.

In this regard, the Policy had a "Program Deductible" of $2 million per occurrence for all perils. In determining whether the deductible is satisfied, the Policy requires that "[a]ll losses, damages or expenses arising out of any one occurrence shall be adjusted as one loss, and from the amount of such adjusted loss shall be deducted [$2,000,000]." Where defense costs are involved, the Policy also requires that the amount of any defense costs "shall be included within and not additional to the total amount of the loss to which this policy's limits and

6

deductibles shall be applied." With these basic Policy provisions in mind, we turn to consider the somewhat complicated procedural history of this case.

B. Procedural Background.

1. *Wattles sues Exide in Superior Court in the State of Washington.*

Under its relevant lease with Wattles, Exide was required to keep the Building "in good order, condition and repair" and surrender it to Wattles "in good condition . . . ordinary wear and tear excepted." Exide's battery formation operations took a toll on the Building over the years, and the sulfuric acid mist emissions that resulted from those operations were at least partly to blame for significant damage to some of the Building's structural components (including the Building's wooden roof trusses).

In March 2013, Wattles filed suit against Exide in Superior Court in Pierce County, Washington (the "State Court Litigation") alleging that Exide breached its obligations under the lease "by failing to keep the property in good order, condition and repair; by us[ing] the property in a manner that tended to create waste; by failing to repair structural damage caused by Exide's operations; and by failing to remove the contaminants present at the property as a result of Exide's operations." In addition to its breach of contract claim, Wattles also alleged that "Exide breached its tort duty to avoid an unreasonable and improper use of Wattles'[s] property so that no substantial damage would be done to it," and that

7

"Exide breached its implied duties of good faith and fair dealing by failing to disclose to Wattles the risks of Exide's operations, and by failing to take reasonable measures to mitigate the risks those operations posed to Wattles'[s] property."  Although section 6.2 of the relevant lease required Exide to "comply promptly with all applicable statutes, ordinances, rules, regulations, orders, and requirements in effect during the term or any part of the term hereof regulating the use by [Exide] of the [Building]," Wattles's trial brief did not argue that Exide breached the lease as a result of (or that Wattles's damages arose from) Exide's failure to comply with any statutes, ordinances, rules, regulations, orders, or other requirements regulating Exide's use of the Building during the term of the lease.

*2.  Exide seeks bankruptcy protection; automatic stay is lifted to allow Wattles to continue State Court Litigation against Exide and pursue recovery of any final judgment or settlement from Exide's insurers (including Ace).*

In June 2013, three months after Wattles filed suit against Exide in state court, Exide sought bankruptcy protection in the United States Bankruptcy Court for the District of Delaware.  This temporarily stayed the State Court Litigation.  In March 2015, the bankruptcy court entered an order styled as an "Order Approving Stipulation Between the Debtor [Exide] and The Wattles Company to Lift the Automatic Stay for a Limited Purpose" (the "Lift-Stay Order").  The Lift-Stay Order, which incorporated by reference a consensual stipulation executed by counsel for Exide and counsel for Wattles, lifted the automatic stay for the sole

8

purpose of allowing Wattles to prosecute the State Court Litigation against Exide to a final judgment.  It also authorized Wattles to engage in legal actions with Exide's insurers to collect against Exide's insurance coverage, but specifically provided that Wattles could "attempt to recover any liquidated final judgment or settlement with respect to the State Court [Litigation]" only from policies issued to Exide that cover the State Court Litigation.  Importantly, "[a]ny final judgment or settlement in the State Court [Litigation was to be] reduced by the amount of any applicable deductible."  The Lift-Stay Order stated that it was not to be deemed or construed to modify, limit, or expand the terms and conditions (including deductibles) of any of the insurance policies issued to Exide, and that Exide's insurers expressly "reserve[d] their rights, defenses, and arguments they may have in any action with Wattles" under such policies.  In other words, the Lift-Stay Order did not "constitute an assignment of the insurance policies or any rights thereto," but instead granted Wattles a limited right to pursue recovery of any "liquidated final judgment or settlement" from Exide's insurers (including Ace), subject to the insurers' rights and defenses under the relevant policies, including applicable deductibles.

*3. Wattles obtains final judgment against Exide in State Court Litigation in the amount of $2,273,623.93, plus post-judgment interest.*

The State Court Litigation concluded on July 7, 2016.  Wattles obtained a final judgment (the "State Court Judgment") in the amount of $2,273,623.93 (the

9

"Final Judgment Amount").  The State Court Judgment gives rise to three separate

dollar amounts that must be considered in the context of this appeal.  First,

$1,437,293.75 of the $2,273,623.93 Final Judgment Amount is designated in the

judgment summary as the "Judgment on Jury Verdict."  This amount represents

damages incurred by Wattles as a proximate result of Exide's breach of the

relevant Building lease, including cost of repair damages.  Second, the judgment

summary designates the remaining $836,330.18 of the Final Judgment Amount as

"Attorney Fees."  This amount represents the attorneys' fees incurred by Wattles

(and not Exide[4]) during Wattles's prosecution of the State Court Litigation against

Exide.[5]  Third, and finally, the State Court Judgment also provided that the Final

Judgment Amount would bear post-judgment interest in the amount of 12% per

annum from the date of entry (July 7, 2016).  According to the district court's

calculations, by the time the district court entered its final coverage award in favor

of Wattles in the later federal lawsuit,[6] the Final Judgment Amount had accrued

$360,295 in post-judgment interest.[7]  Taken together, these three dollar amounts—

---

[4] This distinction is relevant because Wattles would later argue that it also is entitled to credit Exide's attorneys' fees against the $2 million deductible under the Policy.  See text accompanying note 8, infra.

[5] The relevant lease between Exide and Wattles contained a clause entitling the prevailing party in any action to enforce the terms of the lease "to his reasonable attorneys fees to be paid by the losing party as fixed by the court."

[6] See infra, Part I.B.4–5.

[7] Although we have no reason to suspect it is materially incorrect, the parties have not disputed the accuracy of the district court's computation of the amount of interest that had

10

$1,437,293.75 (the "Jury Verdict Amount"), $836,330.18 (the "Wattles Attorneys'

Fees Amount"), and $360,295 (the "Post-Judgment Interest Amount")—total

$2,633,918.93 in losses that are, subject to the $2 million deductible, potentially

within the coverage of the Policy.

    *4.  Ace files a complaint in federal court seeking a declaration of non-coverage; Wattles counterclaims; both parties move the district court for summary judgment.*

    Shortly before the State Court Litigation concluded, Ace filed a federal

complaint in the District Court for the Northern District of Georgia seeking a

declaratory judgment that the Policy afforded no coverage because, inter alia,

"Exide has not incurred $2,000,000 of covered damages, inclusive of Defense

Costs" as required by the Policy deductible.  Wattles answered, asserted several

affirmative defenses, and counterclaimed seeking declaratory relief stating that it

was entitled to collect the full Final Judgment Amount ($2,273,623.93) from the

State Court Judgment from Ace, plus post-judgment interest.  Ace answered

Wattles's counterclaims and asserted twenty-eight affirmative defenses of its own.

As relevant here, Ace argued that the Policy deductible had not been satisfied

because $2 million of covered damages had not been incurred.

accrued when the district court entered its final order in this case and we thus accept the amount as correct for purposes of this appeal.

11

Wattles would eventually file three summary judgment motions.  The gist of Wattles's position was that it was entitled to reimbursement from Ace for the $1,437,293.75 Jury Verdict Amount, the $836,330.18 Wattles Attorneys' Fees Amount, plus the $360,295 Post-Judgment Interest Amount, or a total of $2,633,918.93.  Wattles also argued that the $2 million deductible should be reduced to $1.5 million to account for Exide's defense costs in the State Court Litigation, which the Policy covered up to a limit of $500,000 (the "Exide Defense Costs Amount").[8]

Ace filed its own motion for summary judgment.  As relevant to this appeal, Ace argued that Wattles had not satisfied the Policy deductible because, even assuming the Jury Verdict Amount ($1,437,293.75) was covered by the Policy, Ace was not obligated to make any payments under the Policy "unless and until the covered property damage exceeds $2 million."  With respect to the Wattles Attorneys' Fees Amount ($836,330.18), Ace argued that amount did not count toward the deductible because the legal fees were not incurred by Exide (the named insured under the Policy) in defending against the State Court Litigation but were instead incurred by Wattles (a third-party to the Policy) in prosecuting that litigation against Exide.

---

[8] Cf. note 4 and text accompanying note 5, supra (describing how Wattles also claimed a right to be reimbursed under the Policy for its own attorneys' fees).

In its response to Ace's summary judgment motion, Wattles clarified that it did "not seek to recover its attorney's fees under the Defense Costs [P]rovision of the ACE Policy." Instead, it argued that the Wattles Attorneys' Fees Amount was covered under the Tenants and Neighbors Provision. Specifically, Wattles argued that the Wattles Attorneys' Fees Amount was covered under section 8.(J) of the Policy (and not under the Defense Costs Provision at section 8.(F) of the Policy) because it was a liability that Exide incurred "as a tenant for damage to real and personal property by a peril insured against." Wattles further argued that the condition in the Tenants and Neighbors Provision (i.e., that the extension applied "only to liability incurred in those countries in which a Napoleonic or other civil or commercial code applies due to loss or damage by a peril as defined by such code and as insured hereunder") was satisfied because Exide's liability under the State Court Judgment was "due to loss or damage to Wattles by a peril defined by not less than two applicable Washington commercial codes—OSHA[9] and the IBC[10]— as well as the civil code of Georgia."[11]

---

[9] Here Wattles is referring to the Occupational Safety and Health Act as adopted by the State of Washington.

[10] Here Wattles is referring to the International Building Code as adopted by the State of Washington.

[11] Here Wattles is referring to non-criminal provisions of the Official Code of Georgia.

Ace responded by arguing that Wattles failed to establish that Exide's liability to Wattles in the State Court Judgment arose in a country where a Napoleonic or other civil or commercial code applied, or that such liability arose out of any such code. Ace contended that the State Court Litigation arose out of common law property rights in the State of Washington (where the "common law of England was the law of decision"), and "not out of a code, Napoleonic or otherwise, that created an exclusive right to recover for property damage."

*5. The district court grants Wattles's second and third motions for summary judgment and enters coverage award in the amount of $1,133,918.93; Ace appeals.*

The district court addressed Wattles's three summary judgment motions and Ace's solitary summary judgment motion in an unreported initial order dated September 20, 2017. See generally Order, Ace Am. Ins. Co. v. Exide Techs., Inc., No. 1:16-CV-1600-MHC (N.D. Ga. Sept. 20, 2017), ECF No. 63. As relevant to the deductible issue which is dispositive in this appeal, the district court determined that Wattles satisfied the deductible because it was entitled to recover both the Jury Verdict Amount ($1,437,293.75) and the Wattles Attorneys' Fees Amount ($836,330.18). Id. at 33–38. The district court agreed with Wattles that the Wattles Attorneys' Fees Amount was covered under the Tenants and Neighbors Provision. Id. at 26–29. In reaching this conclusion, the district court found the Tenants and Neighbors Provision to be ambiguous. Id. at 28. It noted "that, as a categorical matter, this provision either does or does not apply in the United States

14

as a whole" and that any ambiguity was compounded because "the provision also fails to define what constitutes a 'civil or commercial code' for purposes of coverage, or the circumstances under which that code must 'apply' for a country to fall within the provision's scope." Id. Finding two "equally plausible" constructions regarding the availability of tenants and neighbors coverage in the United States—i.e., that the specialized coverage might be available only in countries in which a civil or commercial code in the Napoleonic tradition applied, but that the Policy could also be read to extend coverage in common law or other non-civil-law countries with any codified regulations—the district court observed that "it must liberally construe any ambiguity in the Tenants and Neighbors Liability provision in favor of Wattles." Id. at 29. The district court also expressly observed that Wattles was not seeking to recover the Wattles Attorneys' Fees Amount under the Defense Costs Provision but instead sought those fees under the Tenants and Neighbors Provision. Id. at 36. It then "agree[d] with Wattles that, because it was awarded attorney's fees in the [State Court Litigation] pursuant to a prevailing party attorney's fees provision in its lease agreement with Exide, these fees are included as part of the liability Exide incurred as Wattles's tenant." Id.

The district court concluded its first order by also agreeing with Wattles that Wattles was entitled to include the Exide Defense Costs Amount ($500,000) in any calculation of Exide's total loss under the Policy. Id. at 38. It postponed a final

15

calculation of Wattles's coverage award—including a calculation of accrued post-judgment interest—pending Wattles's submission of evidence of the actual amount of defense costs Exide incurred during the State Court Litigation.[12]  Id.

The district court calculated the amount of Wattles's final coverage award in a second order dated November 3, 2017.  See generally Ace Am. Ins. Co. v. Exide Techs., Inc., No. 1:16-CV-1600-MHC, 2017 WL 6551285 (N.D. Ga. Nov. 3, 2017).  It began by reiterating that Wattles was entitled to recover both the Jury Verdict Amount ($1,437,293.75) and the Wattles Attorneys' Fees Amount ($836,330.18), "less the $2 million per-occurrence deductible and inclusive of $500,000 in Exide's defense costs."  Id. at *1–2.  In other words, the district court followed Wattles's lead and reduced the $2 million deductible to $1.5 million to account for the Exide Defense Costs Amount, then subtracted the reduced deductible of $1.5 million from the Final Judgment Amount, for a result of $773,623.93.  See id. at *2.  The district court then added the Post-Judgment Interest Amount ($360,295) to $773,623.93, creating a total coverage award of $1,133,918.93.  Id.

The district court entered final judgment in favor of Wattles in the amount of $1,133,918.93 (or, by the numbers, the $1,437,293.75 Jury Verdict Amount plus

---

[12] Wattles entered an evidentiary submission indicating that Exide incurred $945,675.12 in legal fees and expenses and $229,557.70 in expert fees.  This amount exceeds the $500,000 sublimit for defense costs in the Policy.

16

the $836,330.18 Wattles Attorneys' Fees Amount plus the $360,295 Post-Judgment Interest Amount minus the reduced $1,500,000 deductible). Ace appealed to this Court.

## II.  ARGUMENTS ON APPEAL

With respect to the deductible issue which is dispositive in this appeal, Ace argues that neither the Wattles Attorneys' Fees Amount nor the Post-Judgment Interest Amount is covered by the Policy because the Tenants and Neighbors Provision does not apply in the United States. In particular, Ace insists the Tenants and Neighbors Provision is not ambiguous because application of the pertinent rules of construction leaves only one reasonable interpretation. It contends that the United States is not a country in which a Napoleonic or other civil or commercial code applies and, even if it were, Exide's liability in the State Court Judgment arose from its breach of the lease with Wattles, not a code-defined peril. Ace insists there is no other provision of the Policy—which, it reminds us, is a property policy and not a general liability policy—that could possibly provide coverage for such amounts. Ace suggests that we can assume arguendo that both the Jury Verdict Amount ($1,437,293.75) and the Exide Defense Costs Amount ($500,000) are within the Policy coverage and count against the deductible,[13]

---

[13] Although suggesting we need not reach the issue, Ace notes its position that the $500,000 Exide Defense Costs Amount, although covered under the Policy and counted against the deductible (to the extent actually incurred and claimed), could not be claimed by Wattles

17

because that total is still less than the $2 million deductible.  Thus, Ace's position

is that neither the $836,330.18 Wattles Attorneys' Fees Amount nor the $360,295

Post-Judgment Interest Amount are covered by the Tenants and Neighbors

Provision (or any other provision of the Policy), and thus the $2 million deductible

is not satisfied, and Ace is entitled to the declaratory judgment it seeks.

In response, Wattles argues that it has satisfied the deductible because the

Tenants and Neighbors Provision does provide coverage for the Wattles Attorneys'

Fees Amount and the Post-Judgment Interest Amount.  According to Wattles, this

is either because Ace did not preserve the Tenants and Neighbors Provision issue

for appeal[14] or because Exide's liability as a tenant in the State Court Litigation

was due to loss or damage by a peril defined by not less than three civil or

---

because the Lift-Stay Order did not authorize Wattles to pursue it from Exide's insurers.  In light of our disposition of this appeal, we need not address that issue.

[14] Wattles's waiver arguments are not persuasive.  Because the Tenants and Neighbors Provision is a policy extension and not a policy exclusion, Wattles bore the burden of establishing coverage.  Travelers Home and Marine Ins. Co. v. Castellanos, 773 S.E.2d 184, 186 (Ga. 2015) (adopting "well settled . . . principle that an insured claiming an insurance benefit has the burden of proving that a claim falls within the coverage of the policy" (citation and internal quotation marks omitted)); cf. First Specialty Ins. Corp., Inc. v. Flowers, 644 S.E.2d 453, 455 (Ga. Ct. App. 2007) (observing that "an insurer seeking to invoke a policy exclusion carries the burden of proving its applicability in a given case").  Ace also argued generally in its own summary judgment motion that the policy deductible had not been satisfied.  Moreover, Wattles did not raise the Tenants and Neighbors Provision as a possible basis for coverage until its third motion for summary judgment, and Ace promptly responded to that argument in its reply to Wattles's motion.  The district court took up and squarely decided both the deductible and the Tenants and Neighbors Provision issues, and "[i]n federal practice any question which has been presented to the trial court for a ruling and not thereafter waived or withdrawn is preserved for review."  Evans v. Bexley, 750 F.2d 1498, 1499 n.1 (11th Cir. 1985).

18

commercial codes, including OSHA, the IBC, and the Official Code of Georgia. Moreover, Wattles argues that the Tenants and Neighbors Provision is ambiguous and thus Georgia law requires it to be construed liberally in favor of the insured.

## III.  ISSUE

As indicated above, the dispositive issue in this appeal is the deductible issue—i.e., whether the $2 million deductible has been satisfied.  The resolution of this issue depends upon the proper treatment of four specific items for which Wattles seeks reimbursement from Ace: (1) the $1,437,293.75 Jury Verdict Amount; (2) the $836,330.18 Wattles Attorneys' Fees Amount; (3) the $360,295 Post-Judgment Interest Amount; and (4) the $500,000 Exide Defense Costs Amount.  If items (2) and (3)—the $836,330.18 Wattles Attorneys' Fees Amount and the $360,295 Post-Judgment Interest Amount—are not within the Policy coverage, then Ace is entitled to the declaratory judgment it seeks because the remaining items (1) and (4) total less than the $2 million deductible (i.e., the $1,437,293.75 Jury Verdict Amount and the $500,000 Exide Defense Costs Amount total $1,937,293.75, less than the $2 million deductible).[15]

---

[15] We emphasize that, in this opinion, we merely assume arguendo—but do not decide—that items (1) and (4) both fall within the coverage provisions of the Policy (and would count against the $2 million deductible) and are items on the basis of which Wattles has the authority to benefit.

Importantly, Wattles does not argue on appeal that any provision of the Policy other than the Tenants and Neighbors Provision could apply to provide coverage for either the Wattles Attorneys' Fees Amount or the Post-Judgment Interest Amount.  See Appellee's Br. 34, 35 ("Because the Tenants and Neighbors Liability Extension applies to provide coverage for the Exide Judgment, Wattles'[s] attorney fees awarded by the Exide Judgment are also covered. . . . Wattles has [also] properly established that it is entitled to recover post-judgment interest on the Exide Judgment under § 8.J of the ACE Policy.")  We likewise see no other provision of this property insurance Policy that would provide the extended coverage Wattles seeks.  Thus, if the Tenants and Neighbors Provision does not provide coverage for the Wattles Attorneys' Fees Amount and the Post-Judgment Interest Amount, Wattles will have failed to show that the $2 million Policy deductible has been satisfied.

Accordingly, the dispositive issue in this appeal depends on whether the Tenants and Neighbors Provision provides coverage for the Wattles Attorneys' Fees Amount and the Post-Judgment Interest Amount; and whether the district court erred when it determined that the Tenants and Neighbors Provision was ambiguous and, in construing the Tenants and Neighbors Provision against Ace as the insurer, concluded that it provided coverage for the Wattles Attorneys' Fees Amount and the Post-Judgment Interest Amount.  For the reasons described in

20

greater detail in Part V.B below, we conclude that the district court did err in determining that the Tenants and Neighbors Provision was ambiguous and concluding that it extended coverage under this property insurance Policy for the Wattles Attorneys' Fees Amount and the Post-Judgment Interest Amount.

## IV. STANDARD OF REVIEW AND APPLICABLE LAW

The district court's resolution of the parties' motions for summary judgment involved the construction of an insurance contract, and we review that question of law de novo. Tech. Coating Applicators, Inc. v. U.S. Fid. and Guar. Co., 157 F.3d 843, 844 (11th Cir. 1998); see also Sewell v. Hull/Storey Dev., LLC, 526 S.E.2d 878, 880 (Ga. Ct. App. 1999) ("Construction and interpretation of a contract are matters of law for the court." (citing O.C.G.A. § 13-2-1)). Our review "is plenary and we apply the same legal standards as those employed by the district court." Tech. Coating Applicators, 157 F.3d at 844. Summary judgment is appropriate when, viewing the record in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Sierra Club, Inc. v. Leavitt, 488 F.3d 904, 911 (11th Cir. 2007).

Although the Policy was a part of an insurance program with a worldwide geographic scope, it contained a choice of law provision providing that the law of the State of Georgia would govern the interpretation of the terms and conditions of the Policy. The parties' arguments below and their arguments on appeal focus

21

exclusively on Georgia law, and neither party has argued that the law of any other state or country should apply to the interpretation of the Policy. We agree and look to the law of the State of Georgia to guide our interpretation of the Policy.

## V.  ANALYSIS

### A.  Statement of Relevant Georgia Law.

Under Georgia law, "[a]n insurance policy is a contract and subject to the ordinary rules of contract construction." Am. Strategic Ins. Corp. v. Helm, 759 S.E.2d 563, 565 (Ga. Ct. App. 2014) (citing Hurst v. Grange Mut. Cas. Co., 470 S.E.2d 659, 663 (Ga. 1996)). If the policy language is clear and unambiguous, the contract must be enforced according to its plain terms. Bd. of Comm'rs of Crisp Co. v. City Comm'rs of City of Cordele, 727 S.E.2d 524, 527 (Ga. Ct. App. 2012). But, when an insurance policy is deemed to be ambiguous, it is "construed strictly against the insurer/drafter and in favor of the insured." Hurst, 470 S.E.2d at 663 (citing O.C.G.A. § 13-2-2(5)).

A policy provision is ambiguous when it is "subject to more than one reasonable interpretation." State Farm Auto. Ins. Co. v. Staton, 685 S.E.2d 263, 265 (Ga. 2009); see also Dorsey v. Clements, 44 S.E.2d 783, 787 (Ga. 1947) (observing that a "word or phrase is ambiguous only when it is of uncertain meaning, and may be fairly understood in more ways than one"); Mason v. Allstate Ins. Co., 680 S.E.2d 168, 171 (Ga. Ct. App. 2009) (defining ambiguity as

22

"duplicity, indistinctness, an uncertainty of meaning of expression" such that the provision is susceptible of two or more reasonable interpretations).  One important indicator "of ambiguity in a policy is whether nearly identical or similar language has been construed differently by other courts."  St. Paul Mercury Ins. Co. v. F.D.I.C., 774 F.3d 702, 709 (11th Cir. 2014).

Importantly, though, the cardinal rule to be considered when interpreting an insurance policy under Georgia law is "to determine and carry out the intent of the parties."  Nat'l Cas. Co. v. Ga. Sch. Bds. Ass'n—Risk Mgmt. Fund, 818 S.E.2d 250, 253 (Ga. 2018).  Thus, "a policy provision is not ambiguous even though presenting a question of construction, unless and until an application of the pertinent rules of construction leaves it uncertain as to which of two or more possible meanings represents the true intention of the parties."  Rucker v. Columbia Nat. Ins. Co., 705 S.E.2d 270, 273 (Ga. Ct. App. 2010) (quoting QBE Ins. Co. v. Couch Pipeline & Grading, Inc., 692 S.E.2d 795, 797 (Ga. Ct. App. 2010)); Sapp v. State Farm Fire & Cas. Co., 486 S.E.2d 71, 73 (Ga. Ct. App. 1997); Simmons v. Select Ins. Co., 358 S.E.2d 288, 290 (Ga. Ct. App. 1987); Brown v. Peninsular Fire Ins. Co., 320 S.E.2d 208, 209 (Ga. Ct. App. 1984); Guest v. Horace Mann Ins. Co., 310 S.E.2d 241, 242 (Ga. Ct. App. 1983); see also Auto-Owners Ins. Co. v. Barnes, 373 S.E.2d 217, 219–20 (Ga. Ct. App. 1988) (applying the rule of contract construction—that a specific provision will prevail over one

23

more broadly inclusive—to conclude that terms of coverage specifically set out in the policy prevail over a general statement in the declarations as to the type of property covered, and applying the Georgia rule that no ambiguity exists when the trial court, by application of the pertinent rules of construction, can ascertain the true intention of the parties); 16 Ga. Jur. Insurance § 3:30, Westlaw (database updated May 2019) ("An insurance contract or policy will be deemed ambiguous if its terms are subject to more than one reasonable interpretation . . . [and] ambiguity exists even if all the multiple constructions are logical and reasonable, provided the trial court cannot resolve the conflicting interpretations by applying the rules of contract construction.").  In addition to numerous decisions of the Court of Appeals of Georgia applying the rule—"[a] policy which is susceptible to two reasonable meanings is not ambiguous if the trial court can resolve the conflicting interpretations by applying the rules of contract construction"[16]—the Supreme Court of Georgia has also so ruled.  See Staton, 685 S.E.2d at 265–66 (rejecting the holding of the Court of Appeals that the policy's definition of the term "insured" was ambiguous, applying the canon of construction that the written or typed portion of a policy prevails over the preprinted portion, and concluding that the policy was not ambiguous and that Staton was not an insured); accord U.S. Fire Ins. Co., Inc. v. Capital Ford Truck Sales, Inc., 355 S.E.2d 428, 429, 432–33 (Ga.

---

[16] Murphy v. Ticor Title Ins. Co., 729 S.E.2d 21, 24 (Ga. Ct. App. 2012).

24

1987) (rejecting the position of the Court of Appeals that the excess liability policy was ambiguous, and, after applying the canon of construction—a policy must be examined as a whole in attempting to construe any portion thereof—holding that the excess insurer was not obligated to provide coverage until judgments are rendered against the insured exceeding the limits of underlying insurance).

Additionally, "ambiguity is not to be created by lifting a clause or a portion of the contract out of context," or by making "hypercritical constructions," and the "natural, obvious meaning is to be preferred over any curious, hidden meaning which nothing but the exigency of a hard case and the ingenuity of a trained and acute mind would discover." Payne v. Middlesex Ins. Co., 578 S.E.2d 470, 472 (Ga. Ct. App. 2003) (citations omitted). The policy "should be given a reasonable construction, not beyond that fairly intended with its terms." Id. (citation omitted). Put another way, "the rule of liberal construction of an insurance policy cannot be used to create an ambiguity where none, in fact, exists." Staton, 685 S.E.2d at 266.

Thus, although we have previously observed that the bar for finding an ambiguity in an insurance contract under Georgia law is "low," St. Paul Mercury Ins. Co., 774 F.3d at 709, we also acknowledge that "[t]he courts have no more right or power, by construction, to extend the coverage of a policy or to make it more beneficial to the insured than they do to rewrite the contract and increase the coverage," Parris & Son, Inc. v. Campbell, 196 S.E.2d 334, 339 (Ga. Ct. App.

25

1973). Consequently, "[w]here the language fixing the extent of the liability of an insurer is unambiguous and but one reasonable construction is possible, the court must expound the contract as made." Staton, 685 S.E.2d at 266 (alteration in original) (citation omitted).

Keeping in mind that "[n]o canon of interpretation is absolute" and that "[e]ach may be overcome by the strength of differing principles that point in other directions," Estate of Pitts v. City of Atlanta, 746 S.E.2d 698, 702 (Ga. Ct. App. 2013) (first alteration in original) (citation omitted), several of Georgia's rules of contract construction are particularly helpful in expounding the Policy. As discussed above, the cardinal rule of construing a contract is to ascertain and carry out the intention of the parties. Nat'l Cas. Co., 818 S.E.2d at 253; O.C.G.A. § 13-2-3. In ascertaining the parties' intention, we are directed "to consider the insurance policy as a whole" and seek a construction that "will give effect to each provision, attempt to harmonize the provisions with each other, and not render any of the policy provisions meaningless or mere surplusage." Nat'l Cas. Co., 818 S.E.2d at 253; see also O.C.G.A. § 13-2-2(4). Although it is true that "[w]ords generally bear their usual and common signification," it is also true that "technical words, words of art, or words used in a particular trade or business will be construed, generally, to be used in reference to this peculiar meaning." O.C.G.A. § 13-2-2(2); Western Pacific Mut. Ins. Co. v. Davies, 601 S.E.2d 363, 367 (Ga. Ct.

26

App. 2004) ("In construing a contract of insurance to ascertain the intent of the parties, the court should give a term or phrase in the contract its ordinary meaning or common signification . . . unless the words are terms of art."). The Georgia courts also rely on other contextual clues when attempting to discern the intention of the parties. Of relevance here is the familiar canon of construction noscitur a sociis,[17] which posits that "[w]ords, like people, are judged by the company they keep." Anderson v. Southeastern Fid. Ins. Co., 307 S.E.2d 499, 500 (Ga. 1983) (finding that the "critical phrase" in automobile liability insurance policy under consideration "must be gauged by the words surrounding it"). In light of these principles, we turn to consider the crucial issue: whether Ace and Exide intended the Tenants and Neighbors Provision to apply to Exide's liability to Wattles in this case (i.e., the Wattles Attorneys' Fees Amount and the Post-Judgment Interest Amount).

B.  Wattles failed to show that the $2 million Policy deductible is satisfied because the Tenants and Neighbors Provision does not extend coverage under the Policy to the Wattles Attorneys' Fees Amount or the Post-Judgment Interest Amount.

For the reasons set out below, we conclude that the district court erred when it determined that the Tenants and Neighbors Provision is ambiguous, construed

---

[17] This phrase translates from Latin to mean "it is known by its associates." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 195 (2012).

27

the Policy against Ace, and concluded that the Policy provided coverage for the

Wattles Attorneys' Fees Amount and the Post-Judgment Interest Amount.

   *1. An insurance policy provision is ambiguous only when it may be "fairly"
or "reasonably" construed in more ways than one.*

   We begin by acknowledging that the interpretation advanced by Wattles and

accepted by the district court—i.e., that the Tenants and Neighbors Provision

extends coverage not only in countries where a "Napoleonic" or similar code

applies but also in countries where a non-Napoleonic "civil or commercial" code

applies—is a possible construction of the Policy.  But an insurance policy is not

ambiguous simply because it is possible to construe it in more than one way, or

even because the policy presents a difficult question of construction.  Rather, the

policy must be "fairly understood in more ways than one," Dorsey, 44 S.E.2d at

787 (emphasis added), such that there is "more than one reasonable interpretation,"

Staton, 685 S.E.2d at 265 (emphasis added).  Given the emphasis Georgia law

places on determining the true intention of the parties (when it is possible to do so),

we believe the district court should have considered evidence of that intent as it

was expressed in the words of the Policy.

   *2. Ace's proposed interpretation of the Tenants and Neighbors Provision is
fair and reasonable in light of the context of the Policy in which it appears.*

   We next consider the Tenants and Neighbors Provision in the context of the

whole insurance policy in which it appears.  As noted above, the Policy is a

28

property insurance policy that primarily covers loss or damage to physical property.  It is not a general liability or other policy that would customarily provide coverage for attorneys' fees or post-judgment interest in the absence of a specific policy extension.  This is evident because the Tenants and Neighbors Provision does not appear in section 7 of the Policy, which sets forth the primary coverages under the Policy, but instead appears in section 8 of the Policy, which defines several specific "coverage extensions" that apply in addition to the primary coverages.  Notably, although the parties appear to agree that the Jury Verdict Amount is covered under the Leased Property Coverage Provision in section 7 of the Policy—which we have already assumed arguendo to be true for purposes of resolving this appeal—Wattles does not argue that the Wattles Attorneys' Fees Amount or the Post-Judgment Interest Amount are covered under any of the primary coverages in section 7 of the Policy.  Nor does the Tenants and Neighbors Provision involve a coverage exclusion (all of which appear in section 10 of the Policy).  As a result, we are not called upon in this case to consider whether the Wattles Attorneys' Fees Amount and the Post-Judgment Interest Amount fall within the broad promises of property loss coverage that would customarily be provided by this type of property insurance policy, or whether a policy exclusion applies to abrogate otherwise available primary coverage.  We are instead asked to consider whether the parties intended those amounts—liabilities which arose out of

29

a common law breach of contract and tort action brought in the State of Washington in the United States—to be covered by the specialized coverage extension described in the Tenants and Neighbors Provision.

We also take into account the international character of Exide's 2006–2007 property insurance program. The Program Specifications at the front of the Policy indicate that the Policy was issued in connection with Exide's 2006–2007 property insurance program, and that the program had a "Worldwide" geographic scope. The Program Specifications also expressly excluded from the geographic scope countries that were subject to trade or economic sanctions imposed by the United States. Additionally, the Policy language included specific sublimits for certain losses incurred in the Netherlands, Germany, Japan, and Mexico, and coverage exclusions for certain losses incurred in Spain, France, Germany, and South Africa. At least three of these countries—Mexico, Spain, and France—have legal systems that are based, at least in part, on the civil law legal traditions embodied in the Napoleonic Code. See Martinez v. United States, 828 F.3d 451, 456 (6th Cir. 2016) (noting that Mexico "models its legal system not on Blackstone's common law but on Napoleon's civil law"); Abad v. Bayer Corp., 563 F.3d 663, 670 (7th Cir. 2009) (observing that the law of Argentina is "heavily influenced by the law of other civil law countries, especially the law of France and of Spain and more especially the Napoleonic Code, which remains the basis of Spanish as well as

30

French law"). Also, Ace agreed in the Policy to provide only 20% of the $300 million in coverage (or $60 million of the total risk insured) under Exide's 2006–2007 property insurance program, which suggests to us that other insurers participated in underwriting Exide's domestic and international risk during the 2006–2007 term. Taken together, these provisions indicate that Ace issued the Policy to Exide as one part of a property insurance program that was intended to insure property located in many countries—with different legal systems grounded in various legal traditions—all over the world. Accordingly, we construe the Policy with the international character of Exide's property insurance program in mind.

*3. The term "Napoleonic code" is best construed as a technical word or a word of art.*

The Tenants and Neighbors Provision extends coverage to "[t]he liability which the Insured incurs as a tenant for damage to real and personal property by a peril insured against," but this extended coverage applies only in a very specific circumstance. The crucial provision at issue in this appeal is:

> This extension applies only to liability incurred in those countries in which a Napoleonic or other civil or commercial code applies due to loss or damage by a peril as defined by such code and as insured hereunder.

In construing the Tenants and Neighbors Provision, we conclude it is appropriate, under Georgia law, to view the words used in the phrase "Napoleonic or other civil

31

or commercial code" not in their ordinary sense but instead as "technical words" or "words of art." See O.C.G.A. § 13-2-2(2) ("Words generally bear their usual and common signification; but technical words, words of art . . . will be construed, generally, to be used in reference to this peculiar meaning."). Consequently, we construe the words as referring to the "peculiar meaning" that they might connote to those, including sophisticated parties represented by capable professional advisors negotiating the terms of a large international property insurance program, who would be familiar with the legal distinctions raised by a clear reference to the Napoleonic Code. Indeed, in an insurance Policy replete with peculiar terms, we can think of few terms more lacking in "usual and common signification" than the Policy's use of the term "Napoleonic code." Although it may not mean much to the untrained ear (especially an untrained ear in a common law country), the term carries with it a great deal of meaning to those with even a passing familiarity with the comparative differences between the primary legal traditions of the world.

*4. There are significant differences between common law and civil law legal systems that likely were known to the parties when they agreed to the Policy terms.*

A complete review of the development and characteristics of the Napoleonic Code and civil law systems of the world falls far outside the necessary scope of this opinion. Suffice it to say that we construe the Policy's reference to "Napoleonic code" as a clear reference to modern civil codes that are like those adopted by the principal states of continental Europe in the nineteenth century, "of

32

which the French Code Napoléon of 1804 is the archetype."  John Henry

Merryman & Rogelio Pérez-Perdomo, The Civil Law Tradition: An Introduction to

the Legal Systems of Western Europe and Latin America 11 (3d ed. 2007).  From

and after Napoleon's rise (and eventual fall), the Code he commissioned has

received a warm welcome in certain parts of the world.  Indeed, "[a]lthough this

reception is prominent even in countries that previously were outside the sphere of

French legal interest, such as much of Latin America, the reception nonetheless

occurs only in civil law countries. . . .  [T]he Code civil did not prevail in countries

of the common law."  Alan Watson, The Making of the Civil Law 121 (1981).

And although a legal system need not necessarily involve a comprehensive code of

codified laws to be considered a part of the civil law tradition, Merryman & Pérez-

Perdomo, supra, at 27, at least one commentator has observed that "virtually all

modern civil law systems are codified," Watson, supra, at 100.

The civil law tradition is the world's oldest legal tradition and traces its roots

to about 450 B.C.E., the date of the publication of the Twelve Tables in Rome.

Merryman & Pérez-Perdomo, supra, at 2–3.  The tradition is also grounded in the

Corpus Juris Civilis of Justinian (the Roman emperor who resided in

Constantinople), which dates to 533 C.E.  Merryman & Pérez-Perdomo, supra, at

3–4, 6–11.  Thus, in addition to the fact that civil law jurisdictions typically have a

comprehensive set of codified laws in place, their legal customs and practices are

33

grounded in the Roman tradition.  Id. at 1–14.  This is in contrast to common law legal systems, which trace their roots to the Norman Conquest and the Battle of Hastings in 1066 C.E.  Id. at 3; see also René David & John E. C. Brierley, Major Legal Systems in the World Today 286 (2d ed. 1978) (observing that the common law "did not experience a 'renewal' through Roman law nor was it transformed by means of codification—the two principal characteristics of French and other laws of the Romano-Germanic family").

Other differences exist between most common law and civil law legal systems.  To name a few, the civil law systems in which codes like the Napoleonic Code are typically found often limit the role of judges (viewing them more as specialized clerks and not learned expositors of the law); deemphasize the importance of judicial precedent (with judicial decisions not ordinarily existing as a binding source of law separate from the relevant codification); and proscribe jury trials in civil matters (opting instead for documentary proceedings where decisions are made based on a written record assembled by a judge or clerk).  Merryman & Pérez-Perdomo, supra, at 34–47, 112–24.  See also Piper Aircraft Co. v. Reyno, 454 U.S. 235, 252 n.18, 102 S. Ct. 252, 264 n.18 (1981) (citing John Henry Merryman, The Civil Law Tradition: An Introduction to the Legal Systems of Europe and Latin America 121 (1st ed. 1969), for the proposition that juries are never provided in non-criminal actions in civil law countries).  This is not to say

34

that all of these characteristics are present in every civil law system, or that all civil law systems are the same; they are not.  Nor is this to say that there are no similarities between common law and civil law jurisdictions; there are.  It is only to say that civil law legal systems—especially ones where a comprehensive codification of laws applies—are, on the whole, easily distinguishable from the common law systems with which we are familiar in the United States.  More importantly, we believe Ace and Exide, and the professional insurance advisors who represented them in assembling Exide's 2006–2007 worldwide property insurance program, would have been aware of these distinguishing characteristics.[18]

*5.  The United States is not a country "in which a Napoleonic or other civil or commercial code applies" within the meaning of this Policy as construed under Georgia law.*

---

[18] Although there likely are other reasons the parties included the Tenants and Neighbors Provision in the Policy, one other distinguishing characteristic of the civil law that may have motivated its inclusion is worth noting.  As an example, Article 1733 of the French Civil Code, which appears in a chapter titled "Lease of Things," provides that "[H]e [the tenant] is answerable in case of fire, unless he proves: That the fire happened by a fortuitous event or force majeure, or by a defect of construction.  Or, that the fire originated in a neighboring house." Civil Code, as of 1st July 2013 (France), available at https://www.legifrance.gouv.fr/Traductions /en-English/Legifrance-translations.  This presumption that a tenant is strictly liable to his landlord for fire damage unless he proves he was not at fault "seems to have originated in times when fire insurance was unknown in order to protect the lessor against loss by fire of his leased premises.  The Roman law used it and the French adopted it; but the English, who early developed the contract of insurance, never accepted this legal presumption." Howard B. Shaffer, Case and Comment, La Compagnie d'Assurance Canadienne Nationale v. Marek Siemiatycki, 11 McGill L. J. 92, 95 (1965).  Thus, this unique presumption is yet another distinguishing characteristic of civil law codes grounded in the Napoleonic tradition.

Although we believe we stand on firm ground in concluding that the United

States is a common law country and not a civil law country, that is not the question

we are called upon to answer in this case.[19]  Rather, we are required to answer a

much narrower question: is the United States, within the meaning of this Policy as

construed under Georgia law, a country "in which a Napoleonic or other civil or

commercial code applies?"  In light of the preceding discussion, we easily

conclude that the United States is not a country in which a "Napoleonic code"

applies because, in the context of Exide's worldwide property insurance program,

that phrase is plainly intended to extend coverage for tenants and neighbors

liability only in those civil law countries, like Mexico, Spain, France, and others,

where a comprehensive codification of laws modeled after Napoleon's Code

applies.  The United States clearly is not such a country.

It is a somewhat closer question whether the United States is a country "in

which a Napoleonic or other civil or commercial code applies."  As to the portion

of the phrase reading "or other civil or commercial code," Wattles asks us to

---

[19] We acknowledge that the State of Louisiana and Puerto Rico have legal systems based, in part, on the civil law tradition.  But that does not change the obvious fact that the United States is primarily a common law country, and that the United States is not a country in which a "Napoleonic or other civil or commercial code applies."  Admittedly, this case would be more difficult if any of the material events occurred in Louisiana or Puerto Rico, or if the law of one of those jurisdictions governed the Policy.  But we are not confronted with that case here, and thus we agree with the district court, at least on the facts of this case, that the Tenants and Neighbors Provision "was written to apply on a country-by-country (rather than a jurisdiction-by-jurisdiction) basis."  Ace Am. Ins. Co., No. 1:16-CV-1600-MHC, ECF No. 63, at 28.

36

conclude that "civil or commercial code" includes all civil and commercial codes, even those that might exist in countries with legal systems that are not grounded in the Napoleonic Code or the civil law tradition. Wattles provides as examples of such codes OSHA and the IBC, both of which have been adopted in the State of Washington (where the Building is located and where the State Court Litigation occurred) in one form or another, and the Official Code of Georgia. We again acknowledge that this is a possible interpretation of the Tenants and Neighbors Provision. It is not, however, a fair or reasonable interpretation, especially in light of the other words surrounding the phrase "civil or commercial code."

We find strong support for our conclusion that the interpretation advanced by Wattles and adopted by the district court is unreasonable in our application of the interpretive canon noscitur a sociis. Sometimes referred to as the "associated words canon," noscitur a sociis is "a classical version, applied to textual explanation, of the observed phenomenon that birds of a feather flock together." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 195 (2012); see also Anderson, 307 S.E.2d at 500 ("Words, like people, are judged by the company they keep."). The canon is most useful when words are "conjoined in such a way as to indicate that they have some quality in common." Scalia & Garner, supra, at 196. When the canon applies, it holds that "words grouped in a list should be given related meanings." Id. at 195 (citing Third Nat'l

37

Bank in Nashville v. Impac Ltd., 432 U.S. 312, 322, 97 S. Ct. 2307, 2313 (1977));

see also United States v. Feola, 420 U.S. 671, 708, 95 S. Ct. 1255, 1275 (1975)

(Stewart, J., dissenting) ("One need hardly rely on such Latin phrases as ejusdem

generis[20] and noscitur a sociis to reach this obvious conclusion.").  For example, if

a statute applies to "tacks, staples, nails, brads, screws, and fasteners," it should be

clear "that the word nails does not denote fingernails and that staples does not

mean reliable and customary food items."  Scalia & Garner, supra, at 196.

In choosing to extend coverage under the Tenants and Neighbors Provision

only in countries where "a Napoleonic or other civil or commercial code applies,"

the parties obviously were referring to civil and commercial codes that are

grounded in the civil law tradition embodied in the Napoleonic Code.  To begin,

the three codes referenced in the Tenants and Neighbors Provision (Napoleonic

codes, civil codes, and commercial codes) are grouped in a list that appears in the

same sentence of the Policy, meaning they should be "judged by the company they

keep" and thus given a related meaning.  Anderson, 307 S.E.2d at 500.  Moreover,

the phrase "other civil or commercial code" appears after the words "Napoleonic

or."  This is a strong indication that the parties not only intended to link the term

"civil code" and the term "commercial code" to the term "Napoleonic [code]," but

also intended "Napoleonic [code]" to modify the two code references that followed

---

[20] See note 21, infra.

38

it (and not the other way around).  See Wash. State Dept. of Soc. and Health Servs. v. Guardianship Estate of Keffeler, 537 U.S. 371, 382–85, 123 S. Ct. 1017, 1024–25 (2003) (applying noscitur a sociis and ejusdem generis[21] and concluding that the phrase "'other legal process' should be understood to be a process much like the processes of execution, levy, attachment, and garnishment" that preceded it in the relevant statutory language).

The conclusion that "other civil or commercial code" should not be read to include codes in common law legal systems like the United States, which are fundamentally different from civil law legal systems, is further supported by relevant literature.  In the same way it allows courts to look to dictionaries when determining the ordinary meaning of a term, Georgia law also permits courts to look to information outside the four corners of a contract "to explain the meaning of technical terms employed in written contracts."  See Pace Const. Corp. v. Houdaille-Duvall-Wright Div., Houdaille Indus., Inc., 276 S.E.2d 568, 569 (Ga. 1981) (citation omitted); see also Wilson v. Clark Atlanta Univ., Inc., 794 S.E.2d 422, 432–34 (Ga. Ct. App. 2016) (considering treatise on university administration

---

[21] Ejusdem generis is a related canon of construction that holds that "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  Wash. State Dept. of Soc. and Health Servs., 537 U.S. at 384, 123 S. Ct. at 1025 (alteration in original) (citations omitted).  The Georgia courts also use this rule of construction when interpreting contracts.  See, e.g., York v. RES-GA LJY, LLC, 799 S.E.2d 235, 238 (Ga. 2017).

39

in determining the specialized meaning of the term "tenure" in context of dispute involving administrators and professors in academic setting).  In consulting such information, we note that the original Napoleonic Code contained five books assembled over a period of years from 1804 to 1811: the <u>Code civil</u> (the Civil Code), the <u>Code de procédure civil</u> (the Code of Civil Procedure), the <u>Code de commerce</u> (the Commercial Code), the <u>Code pénal</u> (the Penal Code), and the <u>Code d'instruction crimenelle</u> (the Code of Criminal Procedure).  <u>Napoleonic Code</u>, Black's Law Dictionary (11th ed. 2019); Robert S. Barker, <u>Constitutionalism in the Americas: A Bicentennial Perspective</u>, 49 Univ. of Pitt. L. Rev. 891, 900 n.25 (1988).  Thus, the three codes referenced in the Tenants and Neighbors Provision are related not only because they are grouped in a list that appears in the same sentence of the Policy, but also because the Civil Code and the Commercial Code were two of the five books contained in the original Napoleonic Code.

In addition to the definitions and historical context suggesting that the parties intended to refer to a particular type of civil or commercial code in the Tenants and Neighbors Provision, one noted treatise also helpfully frames the primary issue considered in this opinion as follows:

> If, however, one thinks of codification not as a form but as the expression of an ideology, and if one tries to understand that ideology and why it achieves expression in code form, then one can see how it makes sense to talk about codes in comparative law.  It is true that California has a number of what are called codes, as do some other states in the United States, and that the Uniform Commercial Code

40

has been adopted in most American jurisdictions.  However, although these look like the codes in civil law countries, the underlying ideology—the conception of what a code is and of the functions it should perform in the legal process—is not the same.  There is an entirely different ideology of codification at work in the civil law world.

. . . .

. . . Thus the French Civil Code of 1804 was envisioned as a kind of popular book that could be put on the shelf next to the family Bible or, perhaps, in place of it.  It would be a handbook for the citizen, clearly organized and stated in straightforward language that would allow citizens to determine their legal rights and obligations by themselves.

. . . .

An entirely different set of ideals and assumptions is associated with the California Civil Code, or with the Uniform Commercial Code as adopted in any American jurisdiction.  Even though such codes may look very much like a French or German code, they are not based on the same ideology, and they do not express anything like the same cultural reality.  Where such codes exist, they make no pretense of completeness.  The judge is not compelled to find a basis for deciding a given case within the code.  Usually, moreover, such codes are not rejections of the past; they do not purport to abolish all prior law in their field, but rather to perfect it and, except where it conflicts with their specific present purposes, to supplement it.  Where some provision of a code or other statute appears to be in possible conflict with a deeply rooted rule of the common law, the tendency will be to interpret the code provision in such a way as to evade the conflict.  "Statutes in derogation of the common law," according to a famous judicial quotation, "are strictly construed."

Thus the conservative tendencies of the common law tradition stand in marked contrast to the ideology of revolution from which the spirit of civil law codification emerged.  It is this ideology, rather than the form of codification, that helps to bind civil law nations together in a common legal tradition.

41

Merryman & Pérez-Perdomo, supra, at 27–29, 33.

For the foregoing reasons,[22] we conclude that there is no ambiguity with respect to the non-applicability of the Tenants and Neighbors Provision under the circumstances of this case.  It is clear to us that, when they agreed to extend coverage under the Tenants and Neighbors Provision "only to liability incurred in those countries in which a Napoleonic or other civil or commercial code applies," Ace and Exide did not intend the extension to apply in any country that happened to have just any "civil or commercial code."  Instead, it is clear to us that they intended the extension to apply only in countries that have adopted and apply a comprehensive Napoleonic, civil, or commercial code in the civil law tradition.  Simply put, the United States is not such a country, and neither OSHA, the IBC, nor the Official Code of Georgia is such a code.[23]

---

[22] Although it is not necessary to our holding in this case, we note that Georgia law prefers a construction that will "not render any of the policy provisions meaningless or mere surplusage."  Nat'l Cas. Co., 818 S.E.2d at 253; see also O.C.G.A. § 13-2-2(4).  Ace argues that if the Tenants and Neighbors Provision is read to mean that any country with any non-criminal regulations is a country in which a civil or commercial code applies, then the Tenants and Neighbors Provision "would apply in every country in the world with any codified regulations, impermissibly rendering the limitation on the coverage extension meaningless."  Ace's argument is persuasive, at least to the extent we believe it is highly likely that most if not all of the non-civil-law countries in which Exide planned to operate would have had some form of commercial code, building code, or other codified legal regulations.  But, because we are not inclined to assume or take notice of the fact that every country in the world has at least some sort of commercial code or codified regulation, we do not rely on this canon of interpretation in reaching our conclusion in this case.

[23] Wattles also notes that there is a dearth of cases construing language like that used in the Tenants and Neighbors Provision and argues that this is an indication that the language is ambiguous.  Our research bears out the dearth of cases; our research has not revealed cases in

## VI. CONCLUSION

In conclusion, we hold that the Tenants and Neighbors Provision is not ambiguous and does not provide coverage for the Wattles Attorneys' Fees Amount or the Post-Judgment Interest Amount. This is so because the United States is not a country "in which a Napoleonic or other civil or commercial code applies" within the meaning of this particular insurance policy as construed under Georgia law. Moreover, although one or more "civil or commercial codes" may be in effect in the United States or one or more of its states, those codes are different in kind from the comprehensive codes that are in effect in civil law jurisdictions, and we

---

any jurisdiction construing such language. However, we draw from this no inference supportive of Wattles's position. See St. Paul Mercury Ins. Co., 774 F.3d at 709 (noting that one indicator of ambiguity under Georgia law is when "nearly identical or similar language has been construed differently by other courts"). Rather, the more likely reason for the lack of such case law is that insurers (like Ace) and sophisticated insureds with international property portfolios (like Exide) know exactly what the language means. They know it means that the Tenants and Neighbors Provision extends coverage—beyond the basic loss or damage to property—to liability incurred as a tenant for damage to property only when the liability is incurred in a country in which the Napoleonic Code or other similar comprehensive civil code in the civil law tradition applies.

43

conclude the parties did not intend the Tenants and Neighbors Provision to extend

coverage to countries with codified laws not based in the civil law tradition.[24]

In quickly finding an ambiguity and construing the Tenants and Neighbors

Provision against Ace,[25] the district court ignored the cardinal rule of policy

---

[24] We are mindful that the nature of some legal systems is not easily categorized. Nothing in this opinion should be construed to define the type of civil law systems in which the Tenants and Neighbors Provision applies. That is not the issue before us. We hold only that the parties clearly did not intend the Tenants and Neighbors Provision to apply in common law countries like the United States.

[25] Even if there were ambiguity with respect to the applicability of the Tenants and Neighbors Provision, we have considerable doubt that the ambiguity should be construed against Ace. There are strong indicators that major portions of the instant Policy—including the Tenants and Neighbors Provision—were drafted by Marsh (agent for Exide), not by Starr (agent for Ace). There is a strong indication that Marsh provided a manuscript form which included the Tenants and Neighbors Provision. If that were true, it is not at all clear that Georgia courts would apply the usual rule and construe the ambiguity against the insurer. See, e.g., Am. Strategic Ins. Corp. v. Helm, 759 S.E.2d 563, 567 (Ga. Ct. App. 2014) (noting that "any ambiguities in the contract are strictly construed against the insurer as drafter of the document" and that insurance policies are "strictly construed against the insurer, as they are issued upon printed forms, prepared by experts at the insurer's instance, in the preparation of which the insured has no voice" (emphasis added)). See also Eagle Leasing Corp. v. Hartford Fire Ins. Co., 540 F.2d 1257, 1261 (5th Cir. 1976) (reviewing coverage dispute involving manuscript policy "containing some standard printed clauses but confected especially for [the insured]" and concluding that "[t]here is no purpose in following a legal platitude [i.e., construction against the drafter] that has no realistic application to a contract confected by a large corporation and a large insurance company each advised by . . . informed experts"); 2-6 Appleman on Insurance Law & Practice Archive § 6.1, LEXIS (database updated 2011) ("The rule of adopting a construction most favorable to the insured where two constructions are possible has, of course, no application where the policy or bond was actually prepared by the obligee. Likewise, it has been held that where it was the insured who insisted upon the form of the insurance contract used, the principle that the form should be construed most strongly against the insurer is inapplicable. And where a contract was prepared by the insured's brokers, it is not to be construed most strongly against the insurer.").

Had Ace presented this argument—which it did not—we would have explored the argument, and it may have provided additional support for our conclusion that the Tenants and Neighbors Provision does not apply to provide coverage for Exide's liability for the Wattles Attorneys' Fees Amount and the Post-Judgment Interest Amount. However, because Ace did not raise this issue, we decline to explore it, and express no opinion as to the impact on this case that the issue might have had. In any event, in light of our conclusion that the Tenants and

interpretation in Georgia, which is to determine and carry out the intent of the contracting parties when it is possible to do so.  In the context of Exide's worldwide property insurance program, which was negotiated by two sophisticated parties with the assistance of competent professional advisors (i.e., Starr and Marsh), the district court erred by not considering the peculiar meaning of the technical words in the phrase "Napoleonic code."  It further erred by failing to consider how the peculiar meaning of that phrase should inform a proper understanding of the words surrounding it.

Having concluded that the Tenants and Neighbors Provision does not cover the Wattles Attorneys' Fees Amount or the Post-Judgment Interest Amount, we are left only to determine whether the $2 million deductible was satisfied.  Because the only other loss amounts claimed by Wattles, either as a direct loss or as a credit to the deductible, are the Jury Verdict Amount ($1,437,293.75) and the Exide Defense Costs Amount ($500,000), and because the sum of those two amounts does not exceed $2 million, we conclude that the $2 million Policy deductible has not been satisfied.  The decision of the district court concluding otherwise is therefore REVERSED, and this case is REMANDED to the district court with instructions to grant Ace's motion for summary judgment and enter an order

---

Neighbors Provision is not ambiguous and does not provide coverage for the Wattles Attorneys' Fees Amount or the Post-Judgment Interest Amount, we need not—and expressly do not— address this issue that Ace might have, but did not, raise.

45

declaring that the Policy does not provide coverage for Wattles's claims because

Wattles failed to establish that the $2 million Policy deductible was satisfied.

REVERSED AND REMANDED.