[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-12406

_____

D.C. Docket No. 5:17-cv-00168-TES

OMNI HEALTH SOLUTIONS, LLC,

Plaintiff - Appellant,

versus

ZURICH AMERICAN INSURANCE COMPANY,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(May 21, 2021)

Before GRANT, MARCUS, and JULIE CARNES, Circuit Judges.

JULIE CARNES, Circuit Judge:

Plaintiff Omni Health Solutions, LLC, obtained a commercial property

insurance policy from Defendant Zurich American Insurance Company covering

its medical building in Macon, Georgia (the "Policy"). In 2011, Plaintiff filed an insurance claim with Defendant seeking coverage for a damaged and leaky roof. Eventually, Defendant agreed that covered damage existed, but the parties were unable to agree on a loss amount. Despite a multi-year appraisal process that produced a binding award for structural damage and a binding award for business income loss, the parties continue to dispute the amount of loss Defendant owes Plaintiff.

Plaintiff filed this suit alleging that Defendant breached the Policy and acted in bad faith by failing to make a timely coverage decision, underpaying the amount awarded for structural damage, and refusing to compensate Plaintiff for the diminished value of its property. The district court granted Defendant summary judgment on all of Plaintiff's claims. After careful review, and with the benefit of oral argument, we affirm the district court's grant of summary judgment on Plaintiff's claims seeking additional payments for structural damage and diminished value, but reverse the grant of summary judgment on Plaintiff's claims that Defendant failed to make a timely coverage decision and acted in bad faith.

## I.    BACKGROUND[1]

On February 15, 2011, Plaintiff filed a property insurance claim with Defendant, reporting hail damage to the roof of its medical facility in Macon, Georgia, and water intrusion.  The Policy requires Defendant to give notice of its intentions with respect to a claim within 30 days of receiving a sworn proof of loss.

### 1.    Defendant's Alleged Delay in Making a Coverage Decision

Shortly after Plaintiff reported its claim, Defendant sent one of its representatives, Michael Ferunden, to inspect the roof.  Plaintiff asserts that the inspection did not occur because Ferunden was unable to access portions of the roof.  In any event, during the next few weeks, engineers hired by Plaintiff and Defendant did inspect the roof.  Defendant's independent engineer, Raymond Ramos, inspected the roof on March 10, 2011.  Ramos prepared and delivered a report to Defendant, concluding that the water intrusion on the facility occurred because of wear and tear on an improperly installed and poorly maintained roof, not because of hail.  Plaintiff asserts that Defendant did not provide Plaintiff the Ramos report, or any other document denying coverage, during the 30-day period following the filing of Plaintiff's claim.  Rather, Plaintiff contends that Defendant did not make a coverage decision until September 2011.[2]

---

[1]  Because this appeal arises from a grant of summary judgment to Defendant, we construe all facts in the light most favorable to Plaintiff.

[2]  Although Plaintiff continues to assert on appeal that Defendant did not make a coverage decision until September 2011, the district court, relying on Plaintiff's response to Defendant's

3

Plaintiff's property suffered additional water damage in the summer of 2011, which Plaintiff reported to Defendant. After re-inspecting the property in September 2011, Ferunden determined that the condition of the roof had changed since his initial inspection months earlier, and he concluded that the roof damage was covered by the Policy.

### 2.    An Appraisal Process Produces Two Binding Awards

Following Defendant's acknowledgment of covered damage in September 2011, the parties entered protracted negotiations regarding the amount of Plaintiff's loss. Unable to reach agreement, on January 12, 2012, Plaintiff invoked Section IV.B of the Policy and demanded an appraisal conducted by a three-member panel consisting of two appraisers (one selected by each party) and an umpire (selected by agreement of the two appraisers). Section IV.B of the Policy provides that "[t]he appraisers will state separately the value of the property and amount of loss"

---

statement of undisputed fact, found that "it is undisputed that Defendant informed Plaintiff of its position on March 28, 2011." Defendant stated in paragraph 8 of its undisputed facts that certain information from the Ramos report was communicated to Dr. Green, Plaintiff's managing member, and that Defendant "reiterated its position that there was no covered damage to the roof on or about March 28, 2011." Plaintiff disputed this statement but specifically controverted only the information contained in the Ramos report, stating "Ramos also referred to the lack of insulation." In accordance with Local Rule 56, the district court deemed that Plaintiff admitted facts not specifically denied—meaning that Plaintiff admitted that Defendant had communicated to Dr. Green its position that there was no covered damage to the roof on or about March 28, 2011. Nevertheless, the alleged March 28 communication occurred more than 30 days after Plaintiff reported damage to Defendant. Thus, by itself, Plaintiff's admission would not preclude a claim for breach of the Policy based on Defendant's failure to make a timely coverage decision.

and, if they fail to agree, their differences will be submitted to the umpire and the decision of any two of the three panel members will be binding.

The parties' appraisers first worked to establish an award for structural damage but were unable to agree on a loss amount. Plaintiff's appraiser, Chris Cole, valued the loss at approximately 1.1 million dollars and Defendant's appraiser, Robert Corley, valued the loss in the six-hundred-thousand dollar range. Failing to reach an agreement, the two appraisers selected Michael Wasden as an umpire. Wasden prepared his own estimate of Plaintiff's loss amount for structural damage.

Despite the contentious appraisal process, both parties' appraisers joined umpire Wasden in signing a structural damage award. The award issued on October 8, 2012 and was based on the estimate prepared by umpire Wasden. The structural damage award stated the "AMOUNT OF LOSS" as $886,795.57 in replacement cost value (sometimes referred to as "RCV") and $804,295.98 in actual cash value ("ACV").[3] Without explanation, and in a separate location after the signature block, the award also listed the specific figures for code improvements ($115,116.43) and mold remediation ($222,307.92).

---

[3] The difference between replacement cost value and actual cost value is the depreciation in the property attributable to the loss. The Policy obligated Defendant to pay Plaintiff the replacement cost value if Plaintiff chose to make repairs to the property or the actual cost value if Plaintiff chose not to repair the property.

5

Two months later, on December 14, 2012, the panel issued a business interruption award, fixing the amount of loss for business interruption at $322,455.61. This time, however, Plaintiff's appraiser refused to sign the award. The award nonetheless appeared to be valid at the time because the Policy required only two signatures and both Defendant's appraiser (Corley) and the umpire (Wasden) had signed the award, thereby meeting this requirement.

As it turned out, however, a problem did arise as to the validity of this award because Plaintiff challenged umpire Wasden's impartiality. Specifically, at some point during the appraisal process, umpire Wasden joined a firm that performed work for Defendant, which association Plaintiff believed to have created a conflict of interest. Accordingly, Plaintiff requested that umpire Wasden step down from the appraisal panel, and he agreed to do so. His resignation occurred, however, after the panel had issued the October 2012 structural damage and the December 2012 business interruption awards described above.

Plaintiff subsequently challenged the validity of the structural damage and business interruption awards in Bibb County Superior Court. Plaintiff argued that both awards were invalid because umpire Wasden was not impartial. The Bibb County Superior Court found that umpire Wasden's employment changed "[s]ometime in November 2012 between the first [structural damage] award and the second [business interruption] award" and ruled that the structural damage

award and the business interruption award were not binding because a question existed regarding the umpire's impartiality. *Zurich Am. Ins. Co. v. Omni Health Sols., LLC*, 774 S.E.2d 782, 783–84 (Ga. Ct. App. 2015) (describing facts and lower court ruling). Defendant appealed the Superior Court decision.

Finding the structural damage award to be binding, the Georgia Court of Appeals reversed the superior court's decision to vacate the structural damage award. The court reasoned:

> The record clearly shows that, in addition to the original umpire, both parties' chosen appraisers expressly agreed to the Structural Damage Award in writing. Based on the plain language of the Policy, the Structural Damage Award is binding on the parties, notwithstanding any alleged bias of the original umpire.

*Omni Health Sols.*, 774 S.E.2d at 784. The Georgia Court of Appeals affirmed the superior court's ruling that the business interruption award was not binding based on the umpire's conflict of interest, as the award "issued after the umpire joined a company that performed work for [Defendant] and was not agreed to by [Plaintiff's] appraiser." *Id.* at 785.

Following the Georgia Court of Appeals decision affirming a binding loss amount only for structural damage, the appraisal panel convened with a new umpire to establish loss amounts for business interruption and other categories of Plaintiff's loss. The appraisal panel issued a final award on June 30, 2016.

7

Among other losses, the award set a business income loss of $1,027,961.20 based on 40 months of income loss valued at $25,699.03 per month.

### 3.    The Parties Dispute the Amount of Plaintiff's Covered Losses Under the Two Binding Awards

Following issuance of this final award, Defendant made additional payments to Plaintiff, adjusting the award to account for coverage limits and payments already made to Plaintiff.  In particular, rather than paying 40 months of lost business income as set forth in the final award, Defendant applied the Policy limit of 13 months for business income loss.  Defendant also interpreted the structural damage award to require payment of $886,795.57, which the award indicated to be the replacement cost for the damaged property.  Defendant did not interpret the entry at the bottom of the award specifying the cost of code upgrades and mold remediation as enlarging the $886,795.57 amount awarded for the replacement cost value of the property.  Accordingly, having paid Plaintiff that amount for structural damage, on October 19, 2016, Defendant informed Plaintiff that it had made all required payments.

Plaintiff disagreed that Defendant had made the payments required by the two binding awards.  Specifically, Plaintiff asserted that, in addition to the $886,795.57 that the structural damage award indicated as representing the replacement cost value of the damaged property, the award also required Defendant to pay an additional $337,424, which figure represented the cost of code

8

upgrades and mold remediation that had been identified in a "note" at the bottom of the structural damage award following the signature of the appraisers agreeing to the $886,795.57 RCV award. As to the award for business income loss, Plaintiff argued that Defendant's delay in providing coverage entitled it to an additional 27 months of business income loss beyond the 13-month maximum set out in the policy because Defendant's delay in acknowledging its coverage obligations had caused the remediation and rebuilding process to take even longer, thereby extending the period of Plaintiff's relocation and causing additional expenses.

4.    Plaintiff Files Suit Seeking Additional Payments from Defendant

The parties failed to work out their differences and Plaintiff filed suit on March 28, 2017, in Bibb County Superior Court. Defendant removed the suit to the United States District Court for the Middle District of Georgia.

In this action, Plaintiff contends that Defendant breached its Policy obligations in three ways: (1) failure to timely make a coverage decision (Count I); (2) failure to make full payment of a structural appraisal award (Count II); and (3) failure to pay the diminished value of Plaintiff's property (Count IV). Plaintiff also contends that Defendant's failure to comply with the Policy constitutes bad faith (Count III) and, therefore, Plaintiff should be awarded exemplary damages.

Defendant moved for summary judgment on the breach of contract claims at the conclusion of discovery. The district court granted Defendant summary

judgment on those claims.  The district court also ordered Plaintiff to show cause as to why its bad faith claim should not also be dismissed given the grant of summary judgment on the breach of contract claims.  Plaintiff acknowledged that its bad faith claim could not proceed in the absence of a viable breach of contract claim.  Consequently, the district court granted summary judgment to Defendant on Plaintiff's bad faith claim.  The district court denied Plaintiff's motion for reconsideration of its summary judgment rulings and entered judgment for Defendant.  Plaintiff timely appealed.

## II.　DISCUSSION

On appeal, Plaintiff contends that the district court erred in granting summary judgment on each of Counts I-IV.  Because the fate of Plaintiff's bad faith claim (Count III) depends on our resolution of the breach of contract claims (Counts I, II, and IV), we first address the propriety of granting summary judgment on those claims.

### A.　Standard of Review

We review the district court's grant of summary judgment *de novo*, applying the same legal standards as the district court.  *AEGIS Elec. & Gas Int'l Servs. Ltd. v. ECI Mgmt. LLC*, 967 F.3d 1216, 1223 (11th Cir. 2020).  "Where, as here, the district court's summary judgment rulings involve the interpretation and application of the pertinent terms of an insurance contract, we likewise review *de*

*novo* the district court's construction of the Policy." *Id*. (internal quotations omitted and alterations accepted). "And because this federal action is based on diversity, Georgia's substantive law governs our interpretation of the Policy." *Id*.

### B. The District Court Erred in Granting Summary Judgment on Count I Alleging Breach of Contract for Defendant's Failure to Make a Timely Coverage Decision

Plaintiff asserts in Count I that Defendant breached the terms of the Policy by failing to make a coverage decision and determining the amount of the loss within 30 days of receiving proof of loss from Plaintiff. Defendant disputed the factual premise of this claim, arguing on summary judgment that, within days of the alleged loss, its representative, Ferunden, had denied any coverage obligation and that Defendant's engineer, Ramos, had confirmed this decision before the 30-day period expired. During oral argument in the district court on Defendant's motion for summary judgment, however, Defendant switched gears, arguing for the first time that a contractual limitation period in the Policy rendered Count I time-barred. Specifically, Defendant relied on the provision in the policy that states "No one may bring a legal action against us under this Coverage Part unless: . . . 2. The action is brought within 2 years after the date on which the direct physical loss or damage occurred."

The district court ordered the parties to brief the issue. Defendant filed an amended motion for summary judgment, arguing that Plaintiff had filed suit on the

11

claim asserted in Count I more than four years too late.  In response, Plaintiff argued that the appraisal process tolled the time period for filing suit.

Rejecting Plaintiff's tolling argument, the district court ruled that the two-year contractual limitation period did bar Count I, and it therefore granted Defendant summary judgment on Count I.  The district court acknowledged that under Georgia law the appraisal process generally tolls an insurance policy's limitation period.  The court, however, found it "unclear [] whether all claims related to an insurance policy are tolled by the appraisal process or only those that are affected by or dependent upon the outcome of the appraisal."  Ultimately, the district court found that "the appraisal process did not toll" Count I because it "is based on extra-contractual damages; it is not based on whether Defendant is required to cover the property's alleged loss" and, thus, "the measure of damages is not the loss attributable to a covered damage, as calculated by the appraisal panel."

Plaintiff sought reconsideration of this ruling, explaining that it was the appraisal process that set the damages for this particular claim.  The district court, however, denied Plaintiff's motion for reconsideration as to Count I, holding that Plaintiff had waived this specific argument by failing to make it in its original brief opposing summary judgment.

On appeal, Plaintiff contends the district court erred in ruling that the appraisal process did not toll the contractual period of limitations for Count I.

Plaintiff says the damages sought in Count I are not "extra-contractual," as characterized by the district court, but business income loss that was caused by Defendant's failure to make a timely coverage decision. Plaintiff characterizes Count I damages as "based on the delay in acknowledging coverage and settling the claim, which required [it] to relocate to a temporary office for almost four years." Plaintiff maintains the two-year contractual limitation period should be tolled during pendency of the appraisal and related court proceedings because Plaintiff could not have brought suit during that time period.

Although Defendant does not dispute that Georgia law provides for tolling of the contractual limitations period for claims at issue in the appraisal process, Defendant argues that the limitations period for Count I should not be tolled because the appraisal process did not address the damages sought in Count I. Defendant characterizes Count I as an attempt to impose an "extra-contractual penalty" as a result of an alleged delayed coverage decision. Defendant explains that Plaintiff seeks to leverage breach of the coverage decision provision in Count I to obtain 40 months of lost business income for the delay even though the Policy expressly limits recovery for lost business income to 13 months. Defendant also argues that the district court correctly found that Plaintiff waived any argument that damages for Count I were set by the appraisal process by failing to make this argument in its brief opposing summary judgment and raising it only in a motion

13

for reconsideration.  We address Defendant's waiver argument before turning to the merits.

1.    Plaintiff Did Not Waive Its Argument that the Appraisal Process Determined Damages for Count I

Even though the summary judgment motion deadline specified in the court's scheduling order had passed, the district court allowed Defendant to file an amended motion for summary judgment raising for the first time that Plaintiff's claims were barred by the Policy's two-year contractual limitation period.[4] Defendant filed a short brief stating that contractual limitations provisions are valid and enforceable in Georgia; the contractual limitation required Plaintiff to file any suit against Defendant by February 15, 2013 (two years after Plaintiff's loss); and Plaintiff's claims, which were filed well after 2013, were time-barred.  Defendant's amended summary judgment motion did not address tolling, despite tolling being an obvious potential defense by Plaintiff to any contractual limitation argument.

Plaintiff responded to Defendant's motion, arguing that the contractual limitation period should be tolled for all of its claims during the period of

---

[4]  Plaintiff contends the district court erred in permitting Defendant to file an amended motion for summary judgment after the deadline specified in the court's scheduling order for the filing of dispositive motions.  However, Plaintiff cites no authority supporting that contention. Moreover, the change in schedule did not require additional discovery, virtually no delay ensued, and Plaintiff did not object to modification of the scheduling order at the hearing when the court allowed Defendant to brief its newly-raised contractual limitation issue.  To the contrary, Plaintiff volunteered to file a responsive brief in two weeks.  Accordingly, the district court did not abuse its discretion in permitting Defendant to file an amended summary judgment motion.

appraisal.  In reply, Defendant raised for the first time its argument that Count I should not be tolled because the appraisal process did not address what it characterized as the "consequential damages" sought in Count I.  Without seeking Plaintiff's input as to Defendant's characterization of Count I damages, the district court adopted Defendant's position on Count I, describing these damages as "extra-contractual."

In its motion for reconsideration, Plaintiff responded to the "extra-contractual" argument raised in Defendant's reply brief, noting that the appraisal panel established the amount of business losses sought as damages in Count I and that it therefore properly tolled the contractual limitation period for Count I.  The district court, however, declined to consider Plaintiff's argument in support of reconsideration as to Count I, stating that the facts supporting Plaintiff's argument that the appraisal panel established the business loss amount sought in Count I were not before the court on summary judgment and could not be raised as a basis for reconsideration.

Defendant argues to us that Plaintiff waived the argument that appraisal set damages for Count I by failing to raise it in response to Defendant's amended motion for summary judgment.  We disagree.  It is true that issues not timely raised with the district court will typically not be considered by this court on appeal.  *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004).  Here,

15

however, Plaintiff did timely raise its tolling arguments below.  First, the summary judgment briefing established that the alleged damages for Defendant's allegedly unreasonable delay in making a coverage decision included 27 months of business income loss, in addition to the 13 months Defendant agreed it was liable to pay. The summary judgment record also reflects that the appraisal award for business income loss awarded 40 months of business income loss, the last 27 months being the damages sought in Count I.  In opposing Defendant's amended summary judgment motion, Plaintiff further argued that the appraisal processes, which established business interruption losses, tolled the limitations period for Count I. In short, Plaintiff's argument that Count I damages were set by the appraisal process was presented to the district court during the summary judgment litigation.

Further, given the way this issue played out in the district court, Plaintiff is entitled to make an argument on appeal disputing Defendant's characterization of Count I damages as being outside the scope of the appraisal process.  Defendant only advanced the argument that formed the basis of the district court's summary judgment ruling in Defendant's reply brief supporting summary judgment.  Before the district court, Plaintiff offered its rebuttal at the first available opportunity:  in its motion for reconsideration.  Moreover, Plaintiff is permitted to assert new arguments on appeal supporting its tolling defense and rebutting arguments by Defendant that were first raised in Defendant's reply brief.  *See In re Home Depot*

16

*Inc.*, 931 F.3d 1065, 1086 (11th Cir. 2019) ("[T]here is a difference between raising new issues and making new arguments on appeal.  If an issue is 'properly presented, a party can make any argument in support of that [issue]; parties are not limited to the precise arguments they made below.'" (quoting *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992))).  Accordingly, Plaintiff did not waive its argument that the limitation period for Count I should be tolled because the appraisal process set the value of Plaintiff's business income loss sought as damages in Count I.

> 2.    The Appraisal Process Tolled the Contractual Limitation Period for Count I

Plaintiff maintains that the contractual limitation period for Count I should be tolled for the length of the appraisal process.  Defendant echoes the district court ruling that the limitation period for Count I should not be tolled because the damages sought in Count I are "extra-contractual" and were not part of the appraisal process.  We agree with Plaintiff.

> a.    Count I Damages are not "Extra-Contractual"

We disagree with the district court's ruling that the damages sought by Plaintiff in Count I do not fall within the scope of breach of contract damages permitted by O.C.G.A. § 13-6-2.  "Damages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from such breach and such as the parties contemplated, when the contract was made, as the

17

probable result of its breach." O.C.G.A. § 13-6-2. In contrast, punitive damages, for example, would constitute "extra-contractual" damages. *See Monroe v. Bd. of Regents of Univ. Sys. of Georgia*, 602 S.E.2d 219, 224–25 (Ga. Ct. App. 2004) (distinguishing extra-contractual damages, like punitive damages, from contract damages permitted by O.C.G.A. § 13-6-2).

As alleged in Count I, the damages sought naturally arise from the alleged breach of contract. In particular, Plaintiff asserts that additional damage to its property occurred because Defendant did not timely reach a coverage decision, which delay caused repair of its property to take longer than it should have and resulted in additional business losses that would not have occurred had Defendant complied with its contractual obligations. Thus, while outside the Policy limits for business income loss, the damages Plaintiff seeks to prove in Count I naturally flow from Defendant's breach of contract and, as alleged, could constitute damages within the scope permitted by O.C.G.A. § 13-6-2.[5]

That the claimed damages exceed the Policy limits for covered losses does not necessarily render them "extra-contractual." The loss alleged in Count I flows from Defendant's alleged breach of contract, not from an insured event. Defendant

---

[5] Because the district court dismissed Count I on procedural grounds, the merits of this claim are not before us. Therefore, nothing in this opinion should be construed as suggesting that Plaintiff's claim will ultimately be deemed meritorious, either as a legal or a factual matter.

18

has not cited, nor have we found, any provision in the Policy limiting damages

caused by Defendant's breach of the coverage decision provision to the specified

coverage amounts for damage caused by insured events.[6]  Nor has Defendant cited

any authority for the proposition that damages for breach of an insurance policy are

limited to coverage amounts when Defendant's breach caused the insured to suffer

damage beyond that caused by an insured event.

Regardless of the impact that the policy provision limiting business losses

might have on a claim that a breach of the notification provision triggered

additional business losses that would not have occurred absent the breach, the

question before us is whether an appraisal process tasked with determining the

amount of those business losses operates to toll the limitations period for filing suit

on the breach claim. We say that it does, and turn to the question of tolling.

> b.     The Appraisal Process Established Count I Damages and
>        Tolled the Contractual Limitation Period for Count I

Under Georgia law, an agreement by the parties to pursue an appraisal

process to determine the loss amount suffered by the insured operates to toll the

period of limitations set out in the policy.  *Peeples v. W. Fire Ins. Co.*, 99 S.E.2d

349, 351–52 (Ga. Ct. App. 1957).  When tolled, the period of limitations does not

---

[6]  Had Defendant believed that it had a winning argument in its "extra-contractual" contention, one would have expected Defendant to have made this the subject of its summary judgment motion, instead of bootstrapping that argument onto a claim that Plaintiff was outside the limitation period for making the claim.

run during the time it takes to complete the appraisal. *Id*.; *Thornton v. Georgia Farm Bureau Mut. Ins. Co.*, 695 S.E.2d 642, 648 (Ga. 2010).

As explained by the Supreme Court of Georgia, "[t]he appraisal cases appear to be based on the rationale that the time for filing suit should be tolled because both parties have agreed to proceed with an appraisal that will bind them as to the amount of the loss if they proceed to trial on liability (or if they settle)." *Thornton*, 695 S.E.2d at 648 (emphasis in original). "The appraisal clause determines amount of loss. A suit on the policy is necessary to determine liability. The appraisal process is . . . the method by which the parties have contractually agreed to settle their differences with regard to the amount of loss." *Id*. (quoting *S. Gen. Ins. Co. v. Kent*, 370 S.E.2d 663, 665 (Ga. Ct. App. 1988)). "Thus, in appraisal cases, a trial cannot proceed until the appraisal process is complete." *Id*. at 649.

Here, as stated in the Policy, the parties agreed to an appraisal if there is a "disagree[ment] on the value of the property or the amount of loss." Plaintiff disputed the "value of [his] loss" and demanded that appraisal. Plaintiff's alleged loss included business losses associated with its years-long displacement from its insured property. Accordingly, the appraisal process determined what the amount of that loss was. The appraisal panel issued a binding award setting Plaintiff's business income loss at $1,027,961, based on 40 months of loss valued at $25,699 per month. 2Plaintiff seeks as damages for the breach alleged in Count I the

20

entirety of this loss determined by the appraisers, not just the loss attributable to the 13-month period limited by a different provision of the Policy.

The record reflects that the parties agreed to a binding appraisal process to set the value of Plaintiff's business income loss, that the appraisal process established a binding loss amount for the damages sought in Count I, and, therefore, trial could not proceed on Count I until the appraisal process was complete. Defendant contends that tolling should not apply to Count I because it is not a claim at issue in the appraisal process as evidenced by the fact that Plaintiff is seeking business income loss beyond the 13 months awardable under the Policy. We find that argument unpersuasive for several reasons.

First, the Policy does not limit the appraisal process to establishing damages for any particular type of claim. Rather, by the express terms of the appraisal provision, the appraisal process establishes the "amount of loss" suffered by Plaintiff, without regard to coverage limits or liability. *Auto-Owners Ins. Co. v. Neisler*, 779 S.E.2d 55, 59 (Ga. Ct. App. 2015) ("[U]nambiguous terms in an insurance policy require no construction, and their plain meaning will be given full effect. . . ." (internal quotation marks omitted)); *see also Jordan v. Gen. Ins. Co. of Am.*, 88 S.E.2d 198, 200 (Ga. Ct. App. 1955) ("The award, however, is not decisive of the question of the insurer's ultimate liability under the terms of the policy. A suit on the policy would be determinative of that issue."). Nor does the

21

appraisal provision restrict the panel's assessment of the insured's loss to covered losses. Had the parties intended appraisal to establish only "covered loss," the appraisal provision presumably would have stated as much given that the Policy regularly distinguishes between "amount of loss" and "covered loss."[7] *Nat'l Cas. Co. v. Georgia Sch. Boards Ass'n-Risk Mgmt. Fund*, 818 S.E.2d 250, 253 (Ga. 2018) ("In making the determination of intent, a court is to consider the insurance policy as a whole . . . ."). Moreover, consistent with the plain terms of the appraisal provision, the record reflects that the parties and the appraisers understood that the appraisal panel was tasked with determining the amount of Plaintiff's loss, not whether a loss was covered. As correctly explained by Plaintiff's appraiser, "We're not applying coverage. We're simply framing the award so that coverage can be applied." That is, the sole purpose of the appraisal is to establish the amount of insured's loss, not determine liability or damages. *See Thornton*, 695 S.E.2d at 648.

Second, whether the claim is for coverage under the policy or one for damages caused by Defendant's breach of a separate policy provision—like the claim alleged in Count I—makes no difference in this case where the alleged damages overlap with the loss amount at issue in the appraisal. As explained

---

[7] For instance, the Policy states that "[w]e will then pay the amount of loss or damage in excess of the Deductible, up to the applicable Limit of Insurance." It further provides that "[w]e will pay for covered loss or damage within 30 days."

above, the rationale for tolling here applies regardless of the basis of liability. Adjudication of Count I depended on completion of the appraisal process which established a contractually binding business income loss amount and set the value of damages potentially awardable should Plaintiff prevail on Count I.

That the appraisal here in fact determined the amount of Plaintiff's business income loss sought as damages in Count I belies Defendant's contention that the appraisal process was "unconnected" to Plaintiff's claim for damages in Count I. Accordingly, for the reasons explained above, we conclude that the appraisal process tolled the contractual limitation period for Count I. Because Defendant does not dispute that Count I was timely filed if the contractual limitation period is tolled during the pendency of the appraisal, we reverse the district court's grant of summary judgment to Defendant on Count I.

C.    **The District Court Properly Granted Summary Judgment on Count II Alleging that Defendant Failed to Pay the Full Amount of the Structural Damage Award**

As noted earlier in the Background section of this opinion, the structural damage award indicated the "AMOUNT OF LOSS" as being $886,795.57 in replacement cost value (or "RCV"). Without explanation, and underneath the signature blocks, the award contains a note itemizing the costs to correct two

23

particular types of loss resulting from the damage to the property[8]: code upgrade work and mold remediation. The total amount for code improvements and mold remediation in this entry is indicated to be $115,116.43 and $222,307.92, respectively.

Plaintiff contends that the district court erred when it found that, for purposes of replacement cost value, the award's loss amount of $886,795.57 unambiguously included the amounts for code improvements ($115,116.43) and mold remediation ($222,307.92). Plaintiff argues that by separately listing the cost of code improvements and mold remediation below the signature block, the structural damage award obligated Defendant to pay those amounts <u>in addition to</u> the $886,795.57 listed at the top of the award as the total replacement cost value. In other words, Plaintiff says that the award for replacement cost value was not actually $886,795.57, as the award stated, but was instead $1,224,219.92. Plaintiff arrives at the latter figure by adding to the $886,795.57 RCV award the costs for

---

[8] The calculations read as follows:

| | |
|---|---|
| Code Upgrade Work | $93681.99 |
| Tax on Materials 6% | 2248.37 |
| Sub Total | 95930.36 |
| Overhead and Profit | 19186.07 |
| **Total Code Improvements** | **$115,116.43** |
| | |
| **Mold Remediation** | **$222,307.92** |

code improvement and mold remediation itemized at the bottom of the award document.

The district court disagreed, concluding that the $886,795.57 figure for replacement cost value unambiguously included the cost of code upgrades and mold remediation. In so ruling, the district court relied on the 114-page estimate prepared by umpire Wasden, which estimate broke down the calculations that Wasden used in arriving at the structural damage award ultimately signed by him, the defense appraiser (Corley), and Plaintiff's appraiser (Cole). Consistent with Defendant's position, this estimate does, in fact, include the values for code upgrades and mold remediation in the $886,795.57 bottom-line calculation of RCV. The district court considered it "[c]ommon sense . . . that these numbers would not be included in RCV . . . and then added again to those totals to reach the total amount of the loss." The district court further concluded that the value of code upgrades and mold remediation were "listed separately for clarification purposes."[9] The district court granted summary judgment to Defendant because

---

[9] Although the district court did not explain what the addition of code upgrades and mold remediation values clarified, defense appraiser Corley testified at deposition that after umpire Wasden sent him the draft award, Corley insisted that the values for code upgrades and mold remediation be set out separately on the award to make it clear what portion of the RCV loss amount was attributable to those losses. Corley required this specification to allow the coverage limits for those items to be applied. With Wasden's approval, Corley set these amounts out separately at the bottom of the award before the award was sent to Plaintiff's appraiser for signature.

"the appraisal award is not ambiguous, and there is no question of fact to be determined by a jury."

We affirm the grant of summary judgment to Defendant, but we base that decision not on the 114-page estimate, as there is no evidence that Plaintiff's appraiser Cole ever saw that document before signing the award, but instead on the 7-page summary of this estimate that Cole clearly saw, as it was attached to the award sent to him for his signature.

Under Georgia law, appraisal awards are contractual in nature and subject to the principles of contract formation and interpretation. *See, e.g.*, *Jordan*, 88 S.E.2d at 200–01. At least initially, contract construction is a matter of law for the court to decide. *McKinley v. Coliseum Health Grp., LLC*, 708 S.E.2d 682, 684 (Ga. Ct. App. 2011). In construing the structural damage award, we first decide whether the award is "clear and unambiguous." *Id*. (internal quotations omitted).

Plaintiff contends the operative structural damage award is the single-page document entitled "Award" that is signed by all three members of the appraisal panel. Defendant asserts that the single-page document that Plaintiff considers to be the award is a "summation page" and that the operative award includes the 114-page estimate prepared by umpire Wasden. As noted, this estimate shows that the awarded RCV amount of $886,795.57 already includes amounts for code upgrades and mold remediation.

26

We disagree with Defendant that we can consider the 114-page estimate prepared by umpire Wasden as part of the operative structural damage award. First, the single-page award signed by all three members of the appraisal panel makes no reference to this estimate, meaning that Plaintiff's appraiser Cole would not have been alerted to its existence, at least not via the award document. Further, Defendant cites no evidence that Plaintiff's appraiser Cole received the 114-page estimate before signing the award.

Looking at just the single-page award that all three men signed, it is ambiguous as to whether the $886,795.57 amount of loss awarded for RCV already included amounts for code improvements and mold remediation. "[C]ontractual provisions are ambiguous when they are susceptible to more than one meaning, even if each meaning is logical and reasonable." *Neisler*, 779 S.E.2d at 59 (internal quotations omitted). As presented in the one-page award, it is not clear how the values for code improvements and mold remediation, which appear in a "note" at the bottom of the page below the signature block, relate to the awarded amount of loss specified above the signature block. Indeed, Defendant does not contend, nor did the district court find, that the single-page award, by itself, clearly and unambiguously indicates that code improvements and mold remediation are included in the awarded RCV.

27

Because the operative structural damage award is ambiguous, we must apply the rules of contract construction to resolve the ambiguity. *Neisler*, 779 S.E.2d at 59. "Under the rules of contract construction, parol evidence is admissible to explain an ambiguity in a written contract, although such evidence is inadmissible to add to, take from, or vary the writing itself." *McKinley*, 708 S.E.2d at 684 (internal quotations omitted). Here, the testimony of the two appraisers and umpire Wasden regarding the events leading to issuance of the award constitute parol evidence, as do documents like the 114-page estimate and, as discussed below, the 7-page summary attached to the award sent to Plaintiff's appraiser Cole for his signature. *Turner Broad. Sys., Inc. v. McDavid*, 693 S.E.2d 873, 878 (Ga. Ct. App. 2010) ("[T]he circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement.").

The record reflects that umpire Wasden and defense appraiser Corley both reviewed Wasden's estimate before signing the structural damage award. Consistent with the 114-page estimate, both testified that the awarded RCV included costs for code improvements and mold remediation. Defendant contends this evidence is enough to interpret the amount of loss awarded for RCV to include code improvements and mold remediation as a matter of law. Normally, this shared understanding of the calculated RCV by the umpire and the defense

28

appraiser would carry the day, as only two of the three members of the panel were required to concur in an award. But this is not the normal case because the impartiality of the umpire was successfully challenged by Plaintiff in previous litigation, and the Georgia Court of Appeals upheld the structural damage award in the face of this challenge only because Plaintiff's appraiser Cole also signed the award. Cole's signature meant that at least two qualified members of the panel assented to the award, as required by the appraisal provision of the Policy. *Omni Health Sols.,* 774 S.E.2d at 783–84.

As the award required Cole's concurrence in order to be binding, one must thus determine what Cole's reasonable understanding of the award was to determine if there was a meeting of the minds between him and the defense appraiser as to the amount of the award: that is, was that amount just the $886,795.57 RCV that the award purported to provide or was it that amount plus the specified values for code improvements and mold remediation? As noted, the evidence of record in this appeal does not show that Wasden or Corley provided Cole the 114-page estimate before he signed the award. As for Plaintiff's argument as to its appraiser's understanding of the award amount, Cole testified that he believed the total award to be the specified RCV amount plus the amounts listed for code improvements and mold remediation and he signed the award because that total was pretty close to his own estimate of Plaintiff's loss.

29

Cole's testimony, however, does not end our inquiry. In the first place, his bare assertion that he believed the award to add the over $337,000 representing code improvements and mold remediation to the $886,795.57 awarded as the replacement cost value of the property makes little sense. Were that the import of the award, then the total amount awarded would have been $1,224,219.92: an amount that Cole testified was very close to the loss figure he had arrived at. Yet, given the contentious appraisal process as well as Corley's own role as Defendant's designated appraiser, it would seem almost shocking that Corley would agree to an award that almost doubled the loss amount in the $600,000 range that he had recommended and that instead conferred an award close to the entire amount that Plaintiff's appraiser had advocated.

But one does not have to resolve this contract-construction dispute based on the seeming unreasonableness of an inference that Plaintiff's appraiser Cole engaged in his described thought process. That is, even though we must assume that Cole did not have access to the full 114-page estimate before signing the structural damage award, Cole admitted to having received a 7-page summary of calculations, which was attached to the award that was emailed to him for his signature. The 7-page attachment includes excerpts from umpire Wasden's 114-page estimate. Those excerpts provide summary calculations that clearly show that

code upgrades and mold remediation were included in the calculation of the $886,795.57 replacement cost value set out in the one-page document Cole signed.

Specifically, one of the summary calculation pages expressly includes hazardous material remediation, later identified as mold remediation, in the calculation of RCV. Page 5 provides that the total value for mold remediation is $222,304.92, which number matches the mold remediation value for that category at the bottom of the structural damage award.[10] That same page indicates that the value of code upgrades listed totals $93,681.99, which also matches the value for code upgrades at the bottom of the award. Moreover, the summary also shows values for roof framing and wall code upgrades already included in the cost of work on the main roof and addition of Plaintiff's building used to calculate the RCV. Finally, page 4 shows the total RCV as being $886,795.57.

Admittedly, it is tough sledding for a novice to the appraisal process to figure out from the excerpts provided to Cole how the preparer of the summary reached his calculations. For example, on one page of the summary, the amount for remediating the mold is listed as $181,597.92, although the award lists this cost as $222,307.92: a figure that can be arrived at by adding in the costs of certain

---

[10] The award states that mold remediation is valued at 222,307.92, three dollars more than the summary page. The discrepancy appears to result from a typographical error.

code upgrades to the $181,597.92 figure.[11]  Yet, as noted, page 5 states that the total mold remediation is $222,304.92.  But the point here is not how the arithmetic was done.  If Plaintiff's appraiser Cole had a question about the math, he should have resolved that question prior to signing the award.  The point is that this 7-page summary would have alerted Cole to the fact that mold remediation and code upgrade expenses were obviously included along with all the other expenses in arriving at the $886,795.57 final award of replacement cost value.  Meaning that Cole could not have reasonably thought that the award was calling for a double-counting of these two specified expenses, which is what would have occurred had they been added to the final RCV award.

For the structural damage award to be binding, the parties "must assent to the same thing."  *Fletcher v. C.W. Matthews Contracting Co., Inc.*, 746 S.E.2d 230, 233 (Ga. Ct. App. 2013) (internal quotation marks omitted); *Cox Broad. Corp. v. Nat'l Collegiate Athletic Ass'n*, 297 S.E.2d 733, 737 (Ga. 1982) ("It is well settled that an agreement between two parties will occur only when the minds

---

[11]  Page 4 of the attachment, which contains a table that corresponds to page 114 of Umpire Wasden's estimate, shows the calculation of RCV matching the award of $888,795.57.  The RCV calculation includes $181,597.92 for hazardous material remediation, which is identified on the next page as the total for "mold remediation."  The value of mold remediation identified at the bottom of the award is $222,307.92.  This corresponds to the total cost of mold remediation of $181,597.92 plus the cost of electrical code upgrades ($13,500), fire protection code upgrades ($11,061), plumbing code upgrades ($13,266), and elevator code upgrades ($2,880).  It is not apparent why the total for mold remediation would include these amounts for code upgrades.  Yet, as noted, in the entry showing "Total: Mold Remediation," the figure listed is $222,304.92, which is almost the exact number at the bottom of the award.

of the parties meet at the same time, upon the same subject-matter, and in the same sense."). In this case, to affirm the grant of summary judgment, the evidence must demonstrate the parties assented to a replacement cost value that included the cost of mold remediation and code improvements.

Despite receiving the 7-page attachment along with the award, Cole maintains that he did not understand the awarded RCV loss amount to include values for code improvements and mold remediation when he signed the award. However, under Georgia law, "[i]n determining [whether there was a] mutual assent . . . courts apply an objective theory of intent whereby one party's intention is deemed to be that meaning a reasonable man in the position of the other contracting party would ascribe to the first party's manifestations of assent, or that meaning which the other contracting party knew the first party ascribed to his manifestations of assent." *Cox Broad. Corp.*, 297 S.E.2d at 737. "[T]he circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement, and courts are free to consider such extrinsic evidence." *Id.*; *see also S. Fed. Sav. & Loan Ass'n of Atlanta v. Lyle*, 290 S.E.2d 455, 458 (Ga. 1982) ("Where, as here, ambiguities exist, we may look outside the written terms of the contract and consider all the surrounding circumstances to determine the parties' intent.").

Applying this objective standard, we conclude that a reasonable person would understand Cole's signature on the award to manifest assent to a replacement cost value that included the cost of mold remediation and code improvements given that the 7-page attachment provided to Cole supporting the award expressly shows that mold remediation and code improvement amounts were included in the RCV calculation. Notwithstanding Cole's contradictory, but unsupported, testimony that he believed the stated RCV did not include the cost of code improvements and mold remediation, no reasonable jury viewing the extrinsic record could find that the parties intended to award the cost of code improvements and mold remediation in addition to the stated RCV loss amount. Accordingly, we affirm the district court's grant of summary judgment to Defendant on Count II.

### D.    The District Court Properly Granted Summary Judgment on Count IV Alleging Failure to Pay Diminished Value

Plaintiff alleges in Count IV that Defendant breached the terms of the Policy by failing to pay for the diminished value of Plaintiff's property. Under Georgia law, an insured may recover damages for a building's post-repair diminution in value. *Royal Capital Dev., LLC v. Maryland Cas. Co.*, 728 S.E.2d 234, 238 (Ga. 2012). The appropriate measure of damages for diminution in value is "the difference between pre-loss value and post-repair value" of the building. *State Farm Mut. Auto. Ins. Co. v. Mabry*, 556 S.E.2d 114, 121 (Ga. 2001).

34

Plaintiff contends that the post-repair value of its property is $500,000 less than its pre-loss value. The only proof offered by Plaintiff to support that contention is the testimony of Dr. Green, Plaintiff's managing member. Dr. Green opined at his deposition that the property had lost an estimated $500,000 in value as a result of the mold and environmental conditions that afflicted the property. He reached that conclusion without relying on any real estate person or expert assistance. Instead, he testified that he based his conclusion on his own assessment of value as reflected in mailers he received regarding the sale of other doctors' offices and doctors' buildings.

Fourteen months after his deposition, Dr. Green expanded on the basis for his diminished value testimony in a declaration opposing summary judgment. He stated:

> My [diminished value] opinion will be based upon my knowledge of the building, the nature of the damage to the building, the resulting mold infestation in the building, the stigma likely to attach to buildings that have endured the extent and duration of damage that Omni's building has endured, and the commercial real estate market in the Macon metropolitan area, including sales prices of comparable properties that have not suffered the damage that Omni's building has suffered.

However, Dr. Green did not identify any comparable properties or submit any documentary evidence with his declaration to support his diminished value opinion.

35

1.    The District Court Excludes Dr. Green's Testimony Concerning Diminution in Value

The district court acknowledged that Plaintiff is legally entitled to receive compensation for diminished value if damages can be proven.  However, the district court found Dr. Green unqualified to provide the proffered testimony regarding diminution in value.  The court reasoned that Dr. Green sought to proffer expert opinion testimony, as opposed to lay opinion testimony permitted under Federal Rule of Evidence 701, because "diminution in value, by its very nature and as opposed to a stagnant, moment-in-time value of property, requires knowledge of the value of property but also some specialized knowledge of the effects certain kinds of damages and repairs have on the *change* in that value." (emphasis in original).  The district court considered Dr. Green's proffered testimony "expert in nature because it requires a specialized understanding of the effect of market factors and specific types of damage (e.g., water intrusion and mold) on commercial real property in the area and of what constitutes 'comparable property.'  *See* Fed. R. Evid. 701(c)."  Because Dr. Green did not have any training, experience, or specialized knowledge in commercial property valuation, sales, or repairs, the district court concluded he was not qualified to testify at trial about diminution in value.

The district court further found it "undisputed that Dr. Green did not provide any admissible, factual basis for his opinion that Plaintiff's property value

36

diminished by $500,000.00 because of the damage it incurred." Accordingly, the court granted summary judgment on Count IV for diminution in value.

> 2.  The District Court Did Not Clearly Abuse Its Discretion in Excluding Dr. Green's Testimony Regarding Diminution in Value

Plaintiff contends that Dr. Green's testimony should have been permitted as lay opinion testimony under Federal Rule of Evidence 701. "We review the district court's ruling regarding the admissibility of [Dr. Green's] lay testimony under Rule 701 for a clear abuse of discretion." *United States v. Jayyousi*, 657 F.3d 1085, 1102 (11th Cir. 2011).

Although this is a diversity case involving breach of contract under Georgia law, the Federal Rules of Evidence, not Georgia evidentiary rules, govern the admissibility of evidence. *ML Healthcare Servs., LLC v. Publix Super Markets, Inc.*, 881 F.3d 1293, 1299 (11th Cir. 2018). "Under Federal Rule of Evidence 701, a lay witness may offer opinion testimony if the testimony is '(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.'" *United States v. Estrada*, 969 F.3d 1245, 1270–71 (11th Cir. 2020) (quoting Fed. R. Evid. 701). "Notably, Rule 701 does not prohibit lay witnesses from testifying based on particularized knowledge gained from their own personal experiences." *United*

37

*States v. Jeri*, 869 F.3d 1247, 1265 (11th Cir. 2017) (internal quotation marks omitted).  Generally, "an owner of property is competent to testify regarding its value." *Neff v. Kehoe*, 708 F.2d 639, 644 (11th Cir. 1983) (internal quotation marks omitted).  However, when an "owner bases his estimation solely on speculative factors," courts may exclude the owner's testimony.  *Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1250 (11th Cir. 2018) (internal quotation marks omitted).

The district court did not clearly abuse its discretion in excluding Dr. Green's testimony that the value of Plaintiff's property had been diminished by the repairs and stigma associated with prior mold remediation.  The record lacks any evidence that Dr. Green has any particularized knowledge or experience regarding the value of repaired, mold-remediated properties, much less "the stigma likely to attach to buildings that have endured the extent and duration of damage that [Plaintiff's] building has endured."  Nor does the record reflect that Dr. Green acquired any knowledge from outside sources, such as a realtor, that could inform an opinion regarding the current value of Plaintiff's property.  Dr. Green's diminished value testimony appears to be solely grounded on uninformed speculation regarding the "stigma likely" attached to Plaintiff's repaired building and is inadmissible under Rule 701.  *See Williams*, 889 F.3d at 1250–51 (excluding

as speculative a homeowner's testimony that emissions from a nearby factory diminished the value of her property).

Plaintiff maintains that Dr. Green has knowledge of the Macon commercial real estate market and has acquired knowledge regarding the sales price of medical buildings in the Macon area through various mailers. However, Plaintiff failed to show that the sales reflected on the mailers observed by Dr. Green involved repaired buildings or buildings previously affected by mold. Without such information, Dr. Green's testimony regarding loss in value associated with environmental factors is not "rationally based on [his] perception" and, consequently, is not "helpful to clearly . . . determining a fact in issue." Fed. R. Evid. 701.

Further, the district court did not abuse its discretion in finding that Dr. Green's testimony is based on specialized knowledge within the scope of Rule 702 and, therefore, not admissible as Rule 701 lay opinion testimony. Rule 701 was amended to "eliminate the risk that the reliability requirements set forth in Rule 702 would be evaded through the simple expedient of proffering an expert in lay witness clothing." *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1216 (10th Cir. 2011) (quoting Fed. R. Evid. 701 advisory committee's note). Dr. Green's proffered testimony is properly excluded under Rule 701 if it is "based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

39

Fed. R. Evid. 701(c).  Absent objective evidence of the current value of Plaintiff's property (such as unsuccessful sales efforts, offers received, or estimates provided by trained professionals), which could inform a lay opinion regarding post-repair value, estimating the value of a repaired and mold remediated building requires specialized knowledge within the scope of Rule 702.  *See James River*, 658 F.3d at 1215 ("Accurately accounting for the interaction between depreciation and damage requires professional experience and is beyond the scope of lay opinion testimony.").  It is undisputed that Dr. Green is not an expert in property valuation.  Moreover, the record does not reflect that he has acquired any training, experience, or specialized knowledge in valuing post-repair commercial properties, much less specific knowledge justifying a $500,000 loss in value.  Thus, the district court properly found Dr. Green's diminished value testimony inadmissible.

For the above reasons, the district court did not clearly abuse its discretion in excluding Dr. Green's diminished value testimony for failure to satisfy the requirements of Federal Rule of Evidence 701.  Accordingly, we affirm the district court's grant of summary judgment to Defendant on Count IV alleging failure to pay diminished value.

> ### E.    Given the Reversal of Count I, Summary Judgment on Count III Alleging Bad Faith Must Also Be Reversed

Plaintiff contends in Count III that Defendant acted in bad faith when it failed to comply with the terms of the Policy and that it is entitled to exemplary

damages. Plaintiff concedes that its bad faith claim depends on the viability of its breach of contract claims raised in Counts I, II, and IV. Consequently, after granting summary judgment on all of Plaintiff's claims alleging breach of the Policy, the district court granted summary judgment on Plaintiff's bad faith claim.

On appeal, Defendant argues only that the grant of summary judgment on bad faith should be affirmed because the district court properly granted summary judgment on Plaintiff's underlying breach of Policy claims. Because we have reversed the district court's grant of summary judgment on Count I, and because Defendant does not argue an alternative basis to affirm, we reverse the grant of summary judgment on Plaintiff's bad faith claim to the extent it is based on Count I.

## III.  CONCLUSION

For the reasons explained above, we **AFFIRM** the decision of the district court granting summary judgment on Counts II and IV. We **REVERSE** the grant of summary judgment on Count I. As to the bad faith claim in Count III, we **AFFIRM** the grant of summary judgment on that count to the extent that bad faith is alleged as to Counts II and IV, but **REVERSE** the grant of summary judgment on that count to the extent that bad faith is alleged as to Count I.